UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In Re:                                                              Chapter 11
                                                                    Case No.  21-11549-RAM
CSC Enterprises, Inc. DBA Scully's Tavern

        Debtor.
_____/

## EQUITY ONE (FLORIDA PORTFOLIO) LLC'S
## MOTION TO COMPEL PAYMENT OF POST-PETITION RENT

> **Any interested party who fails to file and serve a written response to this motion within 21 days after the date of service stated in this motion, pursuant to Local Rule 4001-1(C), be deemed to have consented to the entry of an order granting the relief requested in the motion.**

EQUITY ONE (FLORIDA PORTFOLIO) LLC, a Florida limited liability Company ("Landlord"), through counsel and pursuant to 11 U.S.C. § 365(d)(3), moves for the entry of an order compelling payment of rent by the Debtor, and in support thereof, states as follows:

1.      The Debtor owns and operates a neighborhood tavern that has been serving food and drinks to the community for more than 30 years.   [Chapter 11 Case Management Summary, Doc. No. 15, ¶ 3].

2.      On December 31, 2008, GRI-EQY (Sunset 97) LLC and CSC Enterprises, Inc. DBA Scully's Tavern (Debtor), entered into a written Shopping Center Lease Agreement (the "Lease") for use of property located in Miami-Dade County, Florida, known as 9809 SW 72nd Street, Space #1, Miami, Florida, 33173, located in the Shoppes of Sunset Shopping Center (the "Premises").  A copy of the Lease is attached hereto as **Exhibit "A."**

3.      On or about March 28, 2014, GRI-EQY (Sunset 97) LLC and the Debtor entered into a First Lease Amendment and Extension of Lease (the "Amendment"), which modified and extended the terms of the Lease.  A copy of the Amendment is attached hereto as **Exhibit "B."**

4.      On or about June 11, 2015, GRI-EQY (Sunset 97) LLC was merged into Equity One (Florida Portfolio) Inc., the surviving entity being Equity One (Florida Portfolio) Inc.

5.      On or about February 23, 2017, Equity One (Florida Portfolio) Inc. was converted to Equity One (Florida Portfolio) LLC, the surviving entity.

6.      The Lease and the Amendment are collectively referred to herein as the "Lease Documents."

7.      Debtor has a history of defaults under the Lease, as reflected by two eviction actions filed in recent years.

8.      Prior to the pandemic, on or about May 17, 2019, Movant filed a Complaint for Eviction against the Debtor in the County Court, In and For Miami-Dade County, Florida, Case No. 2019-014526-CC-25 (the 2019 Eviction").

9.      On or about June 11, 2019, the 2019 Eviction was dismissed pursuant to a stipulation between the parties.

10.     On or about November 19, 2020, the Movant filed a Complaint for Tenant Eviction and Breach of Lease against the Debtor in the Circuit Court, Eleventh Judicial Circuit, In and For Miami-Dade County, Florida, Case No. 2020-024897-CA-01 (the "2020 Eviction").

11.     On or about February 9, 2021, Movant filed a Motion for Order Requiring Defendant to Pay Rent into the Registry of the Court in the 2020 Eviction, which was scheduled for hearing February 18, 2021 ("Rent Hearing").

12.     On the eve of the Rent Hearing, the Debtor filed this bankruptcy case.

13.     The Debtor is in possession of the Premises.

14.     Pursuant to the Lease Documents, Landlord is owed $109,278.68, plus attorneys' fees, as of the Petition Date.

15.     To date, the Debtor has failed to pay post petition rent which was due on March 1, 2021, in violation of Section 365(d)(3) in the amount of $16,194.44.

16.     A Tenant Detailed Aged Delinquency report, reflecting the accrued but unpaid rent, is attached hereto as **Exhibit "C."**

17.     The Debtor is also obligated to pay the Landlord its attorneys' fees incurred in seeking to enforce the terms of the Lease. See Lease, ¶28(L), pg. 20,("In case of any action or proceeding brought to enforce the terms and provisions of this Lease, the unsuccessful party in any such action or proceeding shall pay for all costs, expenses and reasonable attorneys' fees (at all tribunal levels) incurred by the prevailing party or its agents or both in enforcing the covenants and agreements of this Lease upon the entry of a final nonappealable judgment. If any item is collected by, through or with the advice of any attorney-at-law, Tenant shall pay Landlord's reasonable attorneys' fees and costs of collection. . . .).

18.     A Chapter 11 Debtor-in-Possession must timely perform the obligations of an unexpired lease of nonresidential real property. 11 U.S.C. § 365(d)(3). Specifically, section 365(d)(3) provides, in relevant part, as follows:

> The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2) [11 USCS § 365(b)(2)] [subsec. (b)(2) of this section], arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title [11 USCS § 503(b)(1)].

11 U.S.C. § 365(d)(3).

19.     Pursuant to this section, "[a] debtor or trustee must pay all normal rental payments in commercial space until the lease is rejected." In re Florida Lifestyle Apparel, 221 B.R. 897, 900 (Bankr. M.D. Fla. 1997) (Jennemann, J.); See also In re Granada, Inc., 88 B.R. 369, 372 (Bankr. Utah 1988) ("The language of Section 365(d)(3), that the trustee shall 'timely' perform, clearly contemplates that the trustee will pay the rent as it comes due."). The Debtor has failed to pay the post-petition rent when due.

20.     Not only must a tenant make the required rent payments under the lease as they become due, bankruptcy courts within the Eleventh Circuit have required a debtor-tenant to pay stub rent due and owing to the landlord. In re Deli Den, LLC, 2009 Bankr. LEXIS 3892, *2 (Bankr. S.D. Fla. November 20, 2009) (ordering debtor-tenant to pay stub rent to landlord); See Publix Super Markets, Inc. v. Rhodes, Inc. (In re Rhodes, Inc.), 2005 Bankr. LEXIS 1411, *9 (Bankr. N.D. Ga. June 30, 2005) (noting that tenant paid stub rent owed to landlord).

21.     Landlord is also entitled to the reimbursement of reasonable attorneys' fees, costs, and expenses incurred in the enforcement of its contractual rights under the Lease. See Lease, ¶28(L), pg. 20; Travelers Cas. & Su. Co. of Am. V. Pacific Gas and El. Co., 549 U.S. 443, 448 (2007) (a party is entitled to the reimbursement of attorneys' fees when an "enforceable contract allowing attorneys' fees" exists); In re Beltway Med., Inc., 358 B.R. 448, 452 (Bankr. S.D. Fla. 2006) ("Bankruptcy courts have also interpreted the section 365(d)(3) mandate to 'perform all obligations' to include attorney's fees authorized by a lease.") (Isicoff, C.J.).

22.     In the instant case, the Premises is nonresidential real property, and thus the Lease falls under the purview of Section 365(d)(3). Pursuant to the plain language of Section 365(d)(3), the Debtor has an obligation to pay the post-petition rent as it becomes due, including stub rent. Furthermore, the Lease clearly provides that the Debtor must reimburse Landlord for its reasonable

attorneys' fees incurred in enforcing its rights under Lease, such as seeking a court order compelling the payment of rent. The Lease specifically provides for the recovery of reasonable attorneys' fees incurred in a bankruptcy proceeding.

23.    As a result of Debtor's failure to comply with Section 365(d)(3) and the Lease, this Court should compel the Debtor to pay the unpaid post-petition rent due and owing for March 2021 and all future months; and the Landlord's attorneys' fees incurred in bringing this Motion. The Court should also compel the Debtor to timely pay all future rent as it becomes due pursuant to the terms of the Lease.

WHEREFORE, Landlord, EQUITY ONE (FLORIDA PORTFOLIO) LLC respectfully requests this Court compel the Debtor to: (1) pay Landlord the unpaid post-petition rent due and owing for March 2021, and all future months; (2) pay Landlord its reasonable attorneys' fees incurred in bringing this Motion; (3) timely pay all future rent as it becomes due pursuant to the terms of the Lease; and (4) award Landlord such other and further relief as is just and proper under the circumstances of this case.

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court as set forth in Local Rule 2090-1(A).

Dated:  March 5, 2021.

/s/ Ryan E. Davis
RYAN E. DAVIS
Florida Bar No. 0179851
rdavis@whww.com
**WINDERWEEDLE, HAINES, WARD
  & WOODMAN, P.A.**
Post Office Box 880
Winter Park, FL  32790-0880
(407) 423-4246

(407) 645-3728 (facsimile)
Attorneys for Equity One (Florida Portfolio)
LLC

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 5, 2021, a true and correct copy of the foregoing has been furnished via:

*CM/ECF to:*

U.S. Trustee, 51 S.W. 1st Ave., Suite 1204, Miami, FL 33130
[USTPRegion21.MM.ECF@usdoj.gov]
Steven D. Schneiderman, Office of the US Trustee, 51 S.W. 1st Ave., Suite 1204, Miami, FL 33130 [Steven.D.Schneiderman@usdoj.gov]
Ricardo Corona, Esquire, 3899 NW 7 St., Second Floor, Miami, FL 33126 [bk@coronapa.com]
Tarek Kiem, Subchapter V Trustee, Kiem Law, PLLC, 8461 Lake Worth Road, Suite 114, Lake Worth, FL 33467 [tarek@kiemlaw.com]

*U.S. Mail to:*

CSC Enterprises, Inc. DBA Scully's Tavern, 9809 SW 72nd St., Miami, FL 33713
All creditors and parties in interest listed on the mailing matrix attached hereto

/s/ Ryan E. Davis
RYAN E. DAVIS

Label Matrix for local noticing
113C-1
Case 21-11549-RAM
Southern District of Florida
Miami
Fri Mar  5 12:23:08 EST 2021

CSC Enterprises, Inc. DBA Scully's Tave
9809 SW 72nd St
Miami, FL 33173-4617

Equity One (Florida Portfolio), LLC
c/o Ryan E. Davis
Winderweedle, Haines, Ward & Woodman, PA
329 Park Avenue North
Second Floor
Winter Park, FL 32789-7408

American Express
PO Box  650448
Dallas, TX 75265-0448

Chris Hirsh
9733 SW 92nd Terr
Miami, FL 33176-1801

Department of the Revenue
5050 West Tennessee Street,
Tallahassee, FL 32399-0100

EQUITY ONE (FLORIDA PORTFOLIO) LLC
c/o Richard Cohen
811- A North Olive Ave
West Palm Beach, FL 33401-3709

Internal Revenue Service
7850 SW 6th Court
STOP # 5730
Fort Lauderdale, FL 33324-3210

Louis J Terminello, Trustee
600 Brickell Ave, Suite 3600
Miami, FL 33131-3073

Office of the US Trustee
51 S.W. 1st Ave.
Suite 1204
Miami, FL 33130-1614

Small Business Administration
14925 Kingsport Road
Fort Worth, TX 76155-2243

Ricardo Corona Esq.
3899 NW 7 St, Second Floor
Miami, FL 33126-5551

Tarek Kirk Kiem
PO Box 541325
Greenacres, FL 33454-1325

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)Miami

(d)Equity One(Florida Portfolio)LLC
c/o Richard Cohen
811- A North Olive Ave
West Palm Beach, FL 33401-3709

End of Label Matrix
Mailable recipients    12
Bypassed recipients     2
Total                  14

SHOPPING CENTER

LEASE AGREEMENT

EXHIBIT "A"

<u>Table of Contents</u>

| | |
|---|---|
| ADA | Article 3 |
| Alterations | Article 10 |
| Assignment; Subletting | Article 19 |
| Base Rent | Article 4 |
| Casualty | Article 14 |
| Common Areas | Article 6 |
| Construction | Article 8 |
| Default | Article 16 |
| Definitions | Article 1 |
| Eminent Domain | Article 15 |
| Estoppel Certificates | Article 25 |
| Force Majeure | Article 28 |
| Gross Sales | Article 4 |
| Hazardous Materials | Article 21 |
| Holdover | Article 20 |
| Indemnity | Article 12 |
| Insurance | Article 12 |
| Landlord's Work | Article 8 |
| Late Rent | Article 4 |
| Leased Premises | Article 2 |
| Mold | Article 21 |
| Notices | Article 26 |
| Operating Expenses | Article 6 |
| Operation of Shopping Center | Article 7 |
| Permits; Liens | Article 10 |
| Percentage Rent | Article 4 |
| Quiet Enjoyment | Article 3 |
| Repairs and Maintenance | Article 10 |
| Rules & Regulations | Article 3 |
| Security Deposit | Article 27 |
| Signage | Article 11 |
| Subordination; Attornment | Article 17 |
| Subrogation | Article 18 |
| Surrender | Article 20 |
| Taxes | Article 5 |
| Tenant's Work | Article 8 |
| Term | Article 2 |
| Use | Article 3 |
| Utilities | Article 9 |

<u>List of Exhibits</u>

A.  Site Plan
B.  Landlord's Work
C.  Shopping Center Sign Criteria
D.  Rules and Regulations
E.  Tenant's Work
F.  Restricted and Prohibited Uses
G.  Form Commencement Date Statement
H.  Guaranty

### SHOPPING CENTER LEASE AGREEMENT

THIS SHOPPING CENTER LEASE AGREEMENT (this "Lease") is made on the 31 day of December _____, 2008 (the "Effective Date"), by GRI-EQY (SUNSET 97) LLC, a Delaware limited liability company, (herein called "Landlord"), and C.S.C Enterprises, Inc., a Florida corporation. (herein called "Tenant").

#### 1. Summary of Defined Basic Lease Provisions.

(a) "Shopping Center": Shoppes of Sunset, located in Miami, Florida (as same may be modified from time to time)

(b) "Leased Premises": That portion of the Shopping Center identified by the shaded or cross-hatched area as shown on the "Site Plan" attached hereto as Exhibit "A".

Space/Unit Number:    1

•Address:    9809 SW 72nd Street, Miami, Florida 33173

(c) "Gross Leasable Floor Area of Leased Premises": an agreed upon area of 3,940 square feet, as measured from (a) the exterior face of all exterior walls, doors and windows; (b) the exterior face of all interior walls, doors and windows separating the Leased Premises from Common Areas (as defined in Article 6 below), if any, and (c) the center line of all interior walls separating the Leased Premises from adjoining leasable premises. The Gross Leasable Floor Area of the Leased Premises includes all interior space whether or not occupied by projections, structures or columns, and if a store front is recessed from the lease line, the area of the recess for all purposes lies within the Gross Leasable Floor Area of the Leased Premises.

(d) "Commencement Date":   January 1, 2009

(e) "Rent Commencement Date": January 1, 2009

(f) "Lease Term":

"Initial Term":    Approximately five (5) years following the Commencement Date, unless sooner terminated in accordance with the terms and conditions of this Lease.  If the Commencement Date is not the first day of the month, then the first Lease Year of the Lease Term shall also include the partial month from the Commencement Date to the last day of such partial month.  Notwithstanding the above, the Lease Term shall expire on the last day of the last month of the last Lease Year (as defined herein).

(g) "Base Rent":    Base Rent shall be payable during each Lease Year, commencing on the Rent Commencement Date, in accordance with the following:

| Initial Term: | Lease Years | Annual Amount | Monthly Amount |
|---|---|---|---|
| | 01/01/2009 to 12/31/2009 | $94,560.00 | $7,880.00 |
| | 01/01/2010 to 12/31/2010 | $98,342.40 | $8,195.20 |
| | 01/01/2011 to 12/31/2011 | $102,282.40 | $8,523.53 |
| | 01/01/2012 to 12/31/2012 | $106,380.00 | $8,865.00 |
| | 01/01/2012 to 12/31/2013 | $110,636.20 | $9,219.60 |

For the purposes hereof, "Lease Year" shall mean, in the case of the first Lease Year, the twelve (12) consecutive full calendar months beginning on the Rent Commencement Date, plus the partial month, if any, from the Rent Commencement Date to the last day of such partial month. Thereafter, each succeeding Lease Year shall be for a period of twelve (12) consecutive full calendar months, except that the last Lease Year may be more or less than twelve (12) full calendar months.

(h) "Percentage Rent": INTENTIONALLY DELETED

(i) "Breakpoint": INTENTIONALLY DELETED

(j) "Permitted Use of Leased Premises": The Leased Premises shall be used and occupied solely for the operation of a full service, sit-down family style restaurant, where at least eighty percent (80%) of the interior floor area of the Leased Premises (exclusive of kitchen or food preparation area) is utilized for seated dining purposes including the sale of alcoholic beverages for on-premises consumption only and for no other purpose (the "Permitted Use").

(k) Tenant's Trade Name:    Scully's

(l) Tenant's Tax I.D. Number:    ████████

(m) "Security Deposit":    None

(n) "Prepaid Rent":    None

Scully's New Lease (v4).doc
Last printed 12/23/2008 9:19 AM

1

Initials: L

(o)    Total Amount Due at Lease Execution: None

(p)    Landlord's Notice Address:        GRI-EQY (Sunset 97) LLC
                                         1600 Northeast Miami Gardens Drive
                                         North Miami Beach, FL 33179
                                         Attention: Legal Department
                                         (305) 947-1664

                                         With a copy to:

                                         Equity One Realty & Management FL, Inc.
                                         1550 Northeast Miami Gardens Drive
                                         Suite 500
                                         North Miami Beach, FL 33179
                                         Attention: Shoppes of Sunset Property Manager
                                         (305) 672-1234

(q)    Tenant's Notice Address:          9809 SW 72nd Street
                                         Miami, FL 33173
                                         Attention: Chris Hirsh
                                         ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

(r)    "Minimum Tenant Business Hours":   40 hours per week.

(s)    "Broker":                          None

(t)    "Address For Payment of Rent":     P.O. Box 01-9170, Miami Florida 33101-9170

(u)    Guarantors:                        Chris Hirsh
                                          Residential
                                          Address:          9735 Sw 42 Ter
                                          SSN:      ▓▓▓▓▓▓▓▓▓▓

(v)    Tenant's Proportionate Share. A fraction, the numerator of which is the Gross Leasable Floor Area of the Leased Premises, and the denominator of which is the Gross Leasable Floor Area of the Shopping Center (which may change from time to time). Tenant acknowledges that Tenant's Proportionate Share of the Taxes and Operating Expenses under this Lease shall be calculated as provided herein, but is subject to change based upon, among other things, changes to the Gross Leasable Floor Area of the Shopping Center.  Tenant further acknowledges that Landlord reserves the right to change Tenant's Proportionate Share or other method of allocation of any costs, charges or assessments, in any manner which Landlord may, in its discretion, deem to be a fairer or more equitable allocation thereof.  Tenant acknowledges Landlord has not made any warranty, agreement or representation of any kind as to the actual dollar amount of Taxes or Operating Expenses payable hereunder or Tenant's Proportionate Share thereof.

(w)    Gross Leasable Floor Area of Shopping Center. The aggregate of the individual ground floor gross leasable area of all leasable premises within the Shopping Center, excluding the area occupied by the following categories of space:  (a) the area and any buildings demised pursuant to land leases; (b) the area of any single store with a ground floor area in excess of 10,000 square feet; and (c) the area of any unleased space designated by the Landlord for demolition or conversion to Common Areas in connection with a proposed redevelopment. There are or may be other portions of the Shopping Center that will, at Landlord's option, be excluded for purposes of determining the Gross Leasable Floor Area of the Shopping Center.  Any contributions to Taxes and Operating Expenses received by the Landlord from tenants whose premises are excluded in calculating the Gross Leasable Floor Area of the Shopping Center pursuant to this paragraph shall credited towards Taxes and Operating Expenses, respectively.

(X) Prior Lease.  Effective as of the Commencement Date of this Lease, the parties hereby agree that the lease agreement ("Prior Lease") by and between Landlord and Tenant, dated as of June 22, 1993 which lease commenced on January 1, 1989 and ends on December 31, 2008 and covers Space1 of the Shopping Center, shall be automatically terminated and of no further force and effect.

(B) List of Exhibits

A.    Site Plan
B.    Landlord's Work
C.    Shopping Center Sign Criteria
D.    Rules and Regulations
E.    Tenant's Work
F.    Restricted and Prohibited Uses
G.    Form Commencement Date Statement
H.    Guaranty

2.    Leased Premises; Term and Lease Year.
      (A)    In consideration of the rents agreed to be paid and of the covenants and agreements made by the parties hereto, Landlord hereby demises unto Tenant the Leased Premises pursuant to the terms hereof. Landlord and Tenant agree to execute and deliver a supplement to this Lease setting forth the Rent Commencement Date, Commencement Date and expiration of the Lease Term when determinable or within ten (10) business days following a request by the other party, in the form attached hereto as Exhibit "G". If the

Rent Commencement Date has not occurred upon the expiration of twenty-four (24) months following the Effective Date, then this Lease shall thereupon terminate and shall have no further force or effect in law or in equity. Notwithstanding anything herein to the contrary, this Lease shall be effective and in full force as of the Effective Date, and Tenant shall be responsible for the performance of all terms, covenants and conditions contained in this Lease to be performed during any period that the Tenant is in possession of the Leased Premises before the Commencement Date save and except for the payment of any items of Rent. The Leased Premises is located in the Shopping Center in the approximate location set forth in Exhibit "A" herein. The Leased Premises is deemed to contain an amount of square feet of space equal to the Gross Leasable Floor Area set forth in Article 1. The Lease Term shall commence on the Commencement Date. Tenant's duty to pay Rent (as hereinafter defined) shall commence on the Rent Commencement Date. Notwithstanding the foregoing, Tenant shall pay the first month's installment of Rent on the execution hereof, in the amount set forth in Article 1(A)(n), which amount shall be applied as a credit against such first monthly installment as and when due.

    (B)    INTENTIONALLY DELETED

    (C)    In no event shall Landlord be subject to liability for failure to deliver possession of the Leased Premises to Tenant, and the validity of this Lease shall not be impaired under such circumstances. Except as otherwise expressly provided in this Lease, this Lease shall not terminate, nor shall Tenant have any right to terminate this Lease nor shall Tenant be entitled to any abatement or reduction of Rent hereunder, nor shall the obligations of Tenant under this Lease be affected, by reason of (i) the prohibition, limitation or restriction of Tenant's permitted use of all or any part of the Leased Premises, or any interference with such use, by law or ordinance or other governmental regulation or by injunction, (ii) any default on the part of Landlord under this Lease, or under any other agreement to which Landlord and Tenant may be parties, (iii) the bankruptcy, insolvency, reorganization, composition, readjustment, liquidation, dissolution, winding up or other proceeding affecting Landlord or any assignee of Landlord, or (iv) any other cause whether similar or dissimilar to the foregoing. It is the intention of the parties hereto that the obligations of Tenant hereunder shall be separate and independent covenants and agreements, that the Rent and all other sums payable by Tenant hereunder shall continue to be payable in all events and that the obligations of Tenant hereunder shall continue unaffected, unless the requirement to pay or perform the same shall have been terminated pursuant to an express provision of this Lease.

3.    Use of Leased Premises.
    (A)    Permitted Use.    Tenant agrees that the Leased Premises will be used and occupied by Tenant and/or any assignees, sublessees or other occupants (which reference to assignees, sublessees and other occupants shall not be deemed to give Tenant any rights to assign or sublet not specifically set forth in this Lease) only for the Permitted Use under Tenant's Trade Name, and for no other use or purpose whatsoever. Tenant shall not change the Trade Name of the business operated in the Leased Premises as specified herein without the prior written permission of Landlord. Tenant hereby warrants and covenants that Tenant is duly authorized and licensed to use the Trade Name and any other marks and symbols of the business operated in the Leased Premises. Tenant acknowledges and agrees that the Permitted Use of the Leased Premises set forth herein is a critical element of the bargain of the parties hereto and that actual and substantial detriment will result to Landlord and the other tenants and occupants of the Leased Premises in the event that a change or deviation in such use shall occur or be permitted without the express written consents herein required. In the event Tenant violates the Permitted Use clause, in addition to all other remedies available to Landlord, Tenant shall pay to Landlord the sum of 200% of the monthly installment of Base Rent for each month during which the Permitted Use clause is violated. The Leased Premises shall not be used for any of the Restricted and Prohibited Uses set forth in Exhibit "F".

    Security Measures.    Tenant shall be required to maintain order for all restaurant patrons in an orderly fashion, and gathering of restaurant patrons under Tenant's control, whether such restaurant patrons queue or gather inside or outside the Leased Premises or the Shopping Center.

If Landlord determines, in its sole discretion, that security measures need to be provided by Tenant, Tenant shall, upon notice from Landlord, at Tenant's sole cost and expense, provide such security measures as: (i) hire a security guard or guards at times designated by Landlord (especially during the hours before school begins, during lunch periods and after school) ("Security"); and/or (ii) install temporary and removable security devices in areas designated by Landlord ("Security Devices"). Tenant shall be responsible for installation, maintenance, repair, and replacement of Security Devices at the Premises, and Tenant shall use its reasonable efforts to coordinate its Security with Landlord and cooperate to develop procedures with Landlord to implement its Security in an efficient and effective manner. Should Tenant fail to comply with Landlord's directions pursuant to this paragraph of Article 3 hereof, Landlord shall have the right to provide Security and Security Devices on Tenant's behalf, and Tenant shall reimburse Landlord, as Additional Rent, for the cost and expense of such provision.

Tenant hereby agrees that in no event shall Landlord, its agents or employees, have any liability or responsibility for the effectiveness of any of Tenant's Security or Security Devices. Tenant's release and indemnity set forth in Article 12 of this Lease shall, without limitation, apply to all claims or losses arising out of or resulting from the presence or absence of Tenant's Security or Security Devices for the Premises and the Shopping Center.

    (B)    Tenant's Business Operations.    Tenant shall (i) keep the Leased Premises open and operating continuously for business during the Minimum Tenant Business Hours, (ii) conduct Tenant's business in the Leased Premises at all times in a first class, high grade manner consistent with reputable business standards and practices and in a manner which will further the good reputation of the Shopping Center, (iii) keep the Leased Premises at all times fully staffed with a sufficient complement of adequately trained managers and personnel for efficient service, and (iv) keep the Leased Premises at all times fully equipped and fixtured with all necessary displays, decorations, shelving, racks and trade fixtures, (v) keep the Leased Premises at all times adequately stocked with merchandise. No merchandise will be kept, displayed or sold or business solicited in the Shopping Center outside the Leased Premises; no nuisance will be permitted; nothing shall be done which is unlawful, offensive or contrary to any law, ordinance, regulation or requirement of any public authority, or which may be injurious to or adversely affect the quality of the Leased Premises or the Shopping Center, or which might invalidate or increase the insurance rate thereof; no part of the Leased Premises (especially the electric and plumbing systems, the floor and walls) will be overloaded, damaged or defaced; no holes will be drilled in the stone or brickwork or in concrete; Tenant shall not suffer or permit the water in any pipe or plumbing fixture within the Leased Premises to

freeze; no emission of any objectionable odors, sounds or vibrations will be permitted. Tenant shall procure all licenses and permits required for the use or occupancy of the Leased Premises and the business being conducted therein; the storefront, show windows and signs will be repaired, kept clean and in good condition and be illuminated during those days and hours that the Shopping Center is open for business; all merchandise and other property will be delivered to or removed from the Leased Premises only at such reasonable times and by the permitted delivery entrance (to the extent one exists) as may be reasonably designated for such purposes by Landlord. Tenant shall have full responsibility for protecting the Leased Premises and the property located therein from theft and/or robbery, and Tenant shall keep all doors and windows securely fastened when not in use. Notwithstanding the foregoing, in no event shall Tenant be permitted to wash any kitchen equipments and/or cooking pots or pans behind the Leased Premises or any area of the Common Area of the Shopping Center. If the foregoing violation occurs, in addition to all other remedies available to Landlord, Tenant shall be billed for repairs and damages caused to the asphalt and Tenant shall pay the cost thereof within ten (10) business days following the delivery of the bill or invoice to Tenant.

Tenant shall, at Landlord's request and at Tenant's sole cost and expense, provide and install whatever devices, such as insulation, baffling, etc., that may be necessary to prevent any noise, odors, vibrations or water from extending beyond the Premises to adjacent stores and/or Common Areas. Tenant will be responsible to repair in a timely manner, and in a good and workmanlike manner, any damage caused by noise, odors, vibrations or water extending beyond the Premises or caused by the operation of Tenant's business and Tenant agrees to indemnify, defend and hold Landlord, its successors and assigns, harmless against any and all claims, actions, suits, proceedings, costs, expenses, damages and liabilities, including attorneys' fees, arising out of, connected with, or resulting therefrom. If, within twenty (20) days after demand by Landlord to comply with any of the above requirements, Tenant does not commence and diligently prosecute to completion such work, Tenant shall be deemed to be in default of this Lease, and Landlord shall have the right, but not the obligation, the perform such work and bill Tenant for the cost thereof.

Because of the difficulty or impossibility of determining Landlord's damages by way of loss in value of Landlord's interest in the Shopping Center, if Tenant fails to take possession of the Leased Premises or fails to open for business as provided in this Lease, or if Tenant vacates, abandons or deserts the Leased Premises, or if Tenant ceases to operate its business therein as provided in this Lease, then in any such event Landlord shall have, in addition to all other remedies available to Landlord, the right if permitted by law to charge additional Base Rent at the rate which is 25% of the then rate of Base Rent as elsewhere provided in this Lease for the period during which such failure of Tenant is continuing, and said additional Base Rent shall not prevent Landlord from also treating such failure of Tenant as a default under this Lease and Landlord shall nevertheless have all of the rights and remedies provided in this Lease in the case of a default by Tenant. No contention of Landlord that Tenant has vacated, abandoned or deserted the Leased Premises will be defeated merely by reason of Tenant having left all or any part of its trade fixtures or other personal property in the Leased Premises.

(C)    **Tenant's Covenants.**  Tenant shall comply with all laws, rules, statutes, ordinances and regulations now and hereafter affecting the Leased Premises, including, without limitation, all environmental statutes, all regulations, codes, ordinances and the Americans With Disabilities Act ("ADA"). Tenant agrees to comply with all requirements of the ADA and state and local law applicable to the Leased Premises to accommodate its employees, invitees and customers and will be responsible for any accommodations or alterations which need to be made to the Leased Premises to accommodate the Tenant's employees, invitees and customers. Tenant shall not permit the release, emission, disposal, dumping or storage of hazardous wastes (as defined in any such laws) anywhere in the Shopping Center or the Leased Premises, and the provisions of this sentence shall survive the expiration of the Lease Term. Tenant shall keep the Leased Premises free of rodents, vermin, insects and other pests, and provide regular exterminator services at its own expense. Tenant agrees that nothing will be done or omitted which may either prevent the obtaining by Landlord or other tenants of insurance on any part of the Shopping Center or on any personal property thereon, or which may make void or voidable any such insurance, or which may create any extra premiums for any insurance carried by Landlord or other tenants. Tenant agrees to pay to Landlord as Additional Rent any increase in the cost of insurance on the Leased Premises or the Shopping Center as a result of any unauthorized use of the Leased Premises by Tenant or as a result of any violation by Tenant of any provision of this Article 3 or of any other provision of this Lease, but such payment shall not constitute in any manner a waiver by Landlord of its rights to enforce all of the covenants and provisions of this Lease. Tenant will comply with all requirements and recommendations of Landlord's and Tenant's insurance companies and any rating bureau or similar organization, including maintaining and servicing fire extinguishers. Tenant agrees to stock only merchandise Tenant intends to offer for sale at retail at the Leased Premises, use for office or other non-selling purposes only incidental space required for Tenant's Permitted Use conducted at the Leased Premises, not permit the Leased Premises or any portion thereof to be used for lodging purposes, and not permit preparation of food or any cooking in the Leased Premises (unless same is included in the Permitted Use). Tenant shall keep the sidewalks, curbs and ramps (if any) adjacent to the Leased Premises (and also all delivery areas, ramps, loading areas and docks used exclusively by Tenant, if any) in good and safe condition and free from rubbish. Tenant will not make or suffer any waste of the Leased Premises. Landlord shall not be liable for the act of any other tenant or person who may cause damage to or who may interfere with Tenant's use or occupancy of the Leased Premises or Tenant's business.

(D)    **Storm Shutters.**  Where Landlord is required to provide, or provides storm shutters for the Leased Premises, Tenant shall be responsible for storage, safe keeping and installation of such shutters. Tenant shall install such shutters in all events where circumstances could bring damage to the Leased Premises or Shopping Center, and/or when otherwise directed by Landlord. If Landlord shall provide a storage facility for shutters, Tenant shall be responsible for the prompt and orderly retrieval, installation and re-storing of the shutters for the Leased Premises. At the expiration or other termination of this Lease, Landlord shall have the right, in its absolute discretion, to set off against any Security Deposit then held by Landlord the cost of repair or replacement of the shutters for the Leased Premises. The placing of any holes in the storefront or building facade shall be repaired by the Landlord at the Tenant's expense, which expense shall be paid by Tenant to Landlord as other Rent forthwith upon demand.

(E)    **Quiet Enjoyment.**  Upon payment by the Tenant of the Rents and other charges herein provided, and upon the observance and performance of all the covenants, terms and conditions on Tenant's port to be

observed and performed, Tenant shall peaceably and quietly hold and enjoy the Leased Premises for the Term hereby demised without hindrance or interruption by Landlord or any other person or persons lawfully or equitably claiming by, through or under the Landlord, subject, nevertheless, to the terms and conditions of this Lease and all existing or future underlying leases or mortgages encumbering the Shopping Center.

(F)    _Rules and Regulations._  Tenant shall comply with and observe all rules and regulations which Landlord shall from time to time promulgate for the management and use of the Shopping Center (including, without limiting the generality of the foregoing, the rules as set forth in Exhibit "D"  and rules relating to the designation of smoking and non-smoking areas in, around or throughout the Shopping Center, and rules which prohibit or limit smoking in order to fully comply with any applicable governmental ordinance, law or regulation), and Tenant shall cause its subtenants and concessionaries and such subtenants' and concessionaries' and Tenant's respective officers, employees, agents, customers, suppliers, deliverymen and invitees to comply with and observe such rules and regulations.  Landlord shall have the right from time to time to amend, rescind or supplement any rules and/or regulations theretofore promulgated if and to the extent Landlord, in its sole judgment, deems some to be necessary or advisable for the safety, care and cleanliness of the Shopping Center and/or the conduct of high standards of merchandising and services therein.  Tenant agrees to conform to any and all new or amended rules promulgated from time to time by Landlord upon receiving written notice of the same.  Landlord reserves the right, in its absolute and unfettered discretion, to waive any rule in any particular instance or as to any particular person or occurrence.  In the event that Tenant shall violate any of the rules or regulations (or any of the covenants set forth in this Article 3 or Exhibit "F" of this Lease), and in the event that such violation shall continue uncured for a period of five (5) days following notice thereof to Tenant, then, without limiting, or prejudice to, any other right or remedy available to Landlord by reason of such default by Tenant, whether at law, and/or in equity, and/or pursuant to this Lease, Tenant shall be obligated, commencing on such fifth day, to pay to Landlord Fifty Dollars ($50.00) per violation for each day such violation shall continue uncured.  Anything in the foregoing to the contrary notwithstanding, it is specifically understood and agreed that no grace or cure period shall be afforded Tenant in the case of any violation which shall involve (aa) any actual or threatened injury or damage to any person or property, (bb) any violation of applicable law or other restriction which might subject Landlord to any loss or liability, or (cc) any interference with the rights or business operations of any other tenant of the Shopping Center.

4.    Rent.
(A)    _Base Rent._  Tenant shall pay Base Rent as specified in Article 1 in equal monthly installments paid in advance on the first day of each calendar month.  If the Rent Commencement Date is not the first of the month, the Base Rent for that month shall be prorated on a per diem basis (calculated on the basis of a thirty (30) day month).  Should any Lease Year contain more or less than twelve (12) months, Base Rent and other charges for such Lease Year shall be appropriately prorated.  All other payments to be made by Tenant pursuant to this Lease are in addition to Base Rent.  Tenant shall pay Base Rent and other Rent to Landlord at its designated agent at the Address For Payment of Rent as specified in Article 1 (or such other address as Landlord may designate from time to time) without Landlord giving any prior notice or demand and without any right of deduction or set-off whatsoever. The obligation to pay Base Rent and other Rent is an independent, unconditional covenant.

(B)    _Percentage Rent._  INTENTIONALLY DELETED

(C)    _Gross Sales._  INTENTIONALLY DELETED

Within sixty (60) days after the last day of each calendar year during the Term from and after the Rent Commencement Date, (including the last calendar year or partial calendar year  during the Term of this Lease, as to which Tenant's obligation shall survive the expiration of the Term) Tenant shall deliver to Landlord a statement in writing, certified as true and correct by the Tenant, or if the Tenant is a business entity, certified by an authorized financial officer of the Tenant, which statement shall show Gross Sales during such calendar year (or partial calendar year) and shall include an itemization of all deductions therefrom, and, if requested by Landlord, shall be signed under oath.

Tenant agrees that neither Tenant nor any person, firm or corporation who or which controls or is controlled by Tenant shall directly or indirectly, either individually or as a partner, stockholder or otherwise engage in, own or operate any business similar to that authorized to be conducted hereunder, or use or permit the use of the same or a similar trade name, within a radius of three (3) miles from any point on the perimeter of the Shopping Center during the Term; provided, however, that nothing herein shall be construed to prevent operation of any of Tenant's existing stores under their present trade names.

Landlord shall not become or be deemed a partner or a joint venture with Tenant by reason of the provisions of this Article 4.

(D)    _Other Rent._  Base Rent and all other payments required to be made by Tenant (including, but not limited to, Sales Tax (if any), Taxes, Operating Expenses, and Late Rent) shall be deemed to be and are included in the term "Rent", which shall be due and payable on demand or together with the next installment of Base Rent, whichever first occurs, unless another time is expressly provided for payment.  Landlord shall have the same rights and remedies for non-payment of any Rent or any Security Deposit as for a non-payment of Base Rent.

(E)    _Sales Tax and other Assessments._  Tenant shall pay, as other Rent, all sales, use, rental, rental use and other taxes assessed by any governmental authority against the Base Rent and other Rent (or otherwise related to the Leased Premises), as applicable, stated herein ("Sales Tax").  The payment of all Sales Tax shall be made by Tenant on a monthly basis, concurrently with payment of the Base Rent.  In addition, Tenant shall also pay before delinquency in its entirety all taxes and assessments on the furniture, fixtures, equipment, and other property of Tenant located in the Leased Premises; all taxes and assessments on additions and improvements in the Leased Premises belonging to Tenant; all taxes and assessments attributable to its signs, personal property and leasehold interests; all occupancy taxes or other taxes on its right to occupy the Leased Premises; and other taxes imposed on tenants generally.

(F)    _Late Rent._  If any payment of Rent is not paid when due under this Lease, then, in addition to the payment then due, Tenant shall pay Landlord, as other Rent, a late charge ("Late Rent Charge") which shall be the greater of (i) One Hundred and 00/100 Dollars ($100.00), or (ii) five percent (5%) of the amount then due.  In the event Landlord provides Tenant written notice that Tenant has failed to pay an amount due under the Lease

more than two (2) times in any Lease Year or calendar year, the amount of such Late Rent Charge shall be the greater of: (i) Three Hundred and 00/100 Dollars ($300.00), or (ii) ten percent (10%) of the amount then due. Any payment of Rent which is not paid when due shall also bear interest on the payable amount from the date when due until paid at the Default Interest Rate (as defined in Article 28(D)). If any check, bank draft, order for payment or negotiable instrument given to Landlord for any payment under this Lease shall be dishonored for any reason not attributable to Landlord, Tenant shall pay an administrative charge to Landlord of Fifty and 00/100 Dollars ($50.00). Tenant recognizes and agrees that these charges represent, at the time this Lease is made, a fair and reasonable estimate and liquidation of the costs of Landlord resulting from the events described. Should Tenant's check be so returned or dishonored on more than one occasion during the Term of this Lease (or any renewal or extension thereof), then, from and after the dishonor or return of the second of Tenant's checks, all subsequent payments due hereunder during the remainder of the Term of this Lease (and all renewals and/or extensions thereof) shall be tendered to Landlord by certified or cashier's check. The assessment or non-assessment of a Late Rent Charge pursuant to the terms hereof shall be in Landlord's sole discretion, and is in addition to all other rights and remedies Landlord may have under this Lease.

(G)    **Unconditional Obligation.** It is the purpose and intent of Landlord and Tenant that this Lease be construed and treated as a so-called "Triple Net Lease" which shall, except as hereinafter expressly provided to the contrary, yield net to Landlord the Base Rent and Percentage Rent (if any) to be paid by Tenant in each year during the Term of this Lease, and that all costs and expenses including, but not limited to taxes, insurance, utilities, maintenance, repairs and obligations of every kind or nature whatsoever relating to the Leased Premises which may arise or become due during the Term, shall be paid by Tenant. Notwithstanding any alleged defense, counterclaim or offset against Rent, Tenant's obligation to pay Rent hereunder is an independent covenant and Tenant shall continue to pay Landlord all Rent faithfully when due, including during the continuance of any dispute or legal action, subject to reimbursement if directed by a court of competent jurisdiction. Tenant hereby consents to the entry in any court action of an order requiring Tenant to make Rent payments during the pendency of a lawsuit. All Rent due to Landlord under this Lease shall, unless and to the extent expressly otherwise provided herein, be due and payable without any notice, demand, offset, credit, deduction or abatement.

5.    Taxes.
(A) **Taxes.** "Taxes" shall mean and include: real estate taxes for the Shopping Center; special and general assessments (including any community association fees); water and sewer rents and charges including connection or hookup charges; governmental license and permit fees; charges for public or private easements benefiting the Shopping Center; taxes on other areas made available for the common use or benefit of tenants; and all other governmental impositions and charges (extraordinary as well as ordinary, foreseen and unforeseen) which are either a lien on the Shopping Center or any part thereof or which are charged, levied or assessed on, or imposed in connection with, the use, occupancy or possession of the Shopping Center, and/or which appear as a charge on the tax bill given to Landlord by any official taxing authority, and also interest on Tax installment payments; and costs, expenses and fees (including attorneys' and other experts' fees) incurred by Landlord in contesting the validity of, or seeking a reduction in, or seeking to prevent an increase in any such Taxes or assessments, or attempting to obtain any refund thereof or reassessment in the value of the Shopping Center. In the event Tenant installs or constructs a mezzanine or similar structure that increases the taxes for the Shopping Center, Tenant shall pay the entire increase attributable to such structure. If any method of taxation prevailing on the date of this Lease is altered, so as a substitute for the whole or any part of Taxes there is levied or assessed a different kind of tax, the different tax shall be deemed included in "Taxes". However, "Taxes" shall not include any inheritance, estate, succession, transfer, gift, franchise or corporation tax, or any net income tax, profit tax or capital tax imposed on Landlord. A copy of any official tax bills with respect to a governmental tax or assessment shall be conclusive evidence of the amount of a Tax.

(B) **Tenant's Proportionate Share of the Taxes.** As additional and other Rent for each year of this Lease, Tenant shall pay to Landlord, in the manner hereinafter described, Tenant's Proportionate Share (as defined in Article 1) of the Taxes. Notwithstanding the foregoing, at Landlord's option, Tenant's Proportionate Share of the Taxes may be appropriately adjusted to exclude from the denominator thereof any land and/or building(s) in the Shopping Center leased to or occupied by third parties with separate tax lots or parcels for which they directly or indirectly pay taxes; provided that in such event the Taxes paid by such third parties shall also be excluded in the computation of Taxes.

(C) **Payment of Tenant's Proportionate Share of the Taxes.** On the first day of each month in advance commencing on the Rent Commencement Date, Tenant shall pay to Landlord in equal monthly installments one-twelfth (1/12th) of Tenant's annual Proportionate Share of Taxes, based on Landlord's estimates. If the aggregate of Tenant's installments during any period (or part thereof) shall be less than Tenant's Proportionate Share of the Taxes for such period, such deficiency shall be paid by Tenant to Landlord within ten (10) days after written demand therefor. If the aggregate of Tenant's installments during any such period (or part thereof) shall be greater than Tenant's Proportionate Share of the Taxes for such period, such excess shall be applied by Landlord to the next monthly installment(s) of Tenant's Proportionate Share of the Taxes. If the amount of Taxes payable during the current year shall not yet have been billed by the taxing authority, the monthly installment of Tenant's Proportionate Share of the Taxes then payable shall be based on the amount of the corresponding Taxes for the immediately preceding tax year, subject to adjustment (and payment of the adjusted amount by Tenant) when such Taxes are billed or determined. Tenant's Proportionate Share of Taxes shall be prorated for any partial calendar month during the Lease Term. Tenant covenants and agrees that Tenant shall remain liable for and shall pay its Proportionate Share of any year-end reconciliation of Taxes owed by Tenant and payable for the Lease Term hereunder, notwithstanding the expiration or earlier termination of this Lease.

(D) **Personal Property Taxes.** Tenant shall further pay and discharge when due any federal, state, county or municipal tax levied or assessed against the leasehold estate created hereby, and any taxes levied or assessed against any trade fixtures, furnishings, equipment, leasehold improvements, alterations or additions made by Tenant, merchandise and personal property of any kind owned, installed or used by Tenant in or upon the Leased Premises during the Term.

6.    **Common Areas.**
(A)    **Right to Use.** Subject to subparagraph (C) below, Tenant and its employees, agents, and customers shall have the non-exclusive right to the use or benefit of the Common Areas of the Shopping Center to the extent and in the manner reasonably designated by Landlord. Except as otherwise specified in this Lease, Landlord

agrees to make all necessary repairs and maintenance to the Common Areas and to keep same in good condition. Landlord shall have the right, from time to time, to establish, modify and enforce reasonable rules and regulations with respect to the Common Areas.

(B)   Definition.   "Common Areas" is hereby defined as the areas, equipment and facilities of the Shopping Center or of any other land or property made available by Landlord for the safety, benefit or convenience of tenants or their employees, subtenants, customers or invitees, including (as illustrations and not in limitation): parking areas, driveways, truck service ways, sidewalks and curbs; entrances and exits from the adjacent streets; traffic lights, traffic islands, landscaped areas; meter rooms outside individual stores; fencing; lighting facilities; sprinkler system serving landscaped areas or buildings; sewage system outside tenants' stores; directional or safety signs; Landlord's pylon signs (but not individual tenant panels) and sign panels which identify the Shopping Center.

(C)   Changes to Common Areas/Parking.   Subject to Article 7(A) herein, Landlord reserves the right at any time and from time to time to change or reduce or add to the Common Areas. Common Areas shall be under the exclusive control and management of Landlord. Tenant and its employees shall park their vehicles only in areas Landlord designates for employee parking, and in this connection, Tenant agrees: (i) that Tenant shall from time to time furnish Landlord with state motor vehicle license numbers assigned to Tenant's vehicles, and to the vehicles of Tenant's employees; and (ii) that if Tenant's vehicle(s), or the vehicle(s) of any of Tenant's officers, agents, employees or suppliers, shall be parked in any other portion of the Shopping Center, Tenant shall be obligated to pay to Landlord upon demand the sum of Ten and 00/100 Dollars ($10.00) for each such vehicle for each day, or part thereof, such vehicle is so parked, and, to the extent permitted by applicable law, Tenant hereby authorizes Landlord to tow or cause any such vehicle to be towed from the Shopping Center, and Tenant agrees to reimburse Landlord for the cost thereof upon demand, and to otherwise indemnify and hold Landlord harmless with respect thereto. Tenant shall not permit trucks or delivery vehicles used by it to be parked in the Common Areas except where Landlord permits. Landlord may close parts of the Common Areas for such time necessary in its opinion to prevent a dedication or accrual of rights in other persons, or to discourage non-customer parking.

(D)   Operating Expenses.   "Operating Expenses" shall mean and include all costs and expenses incurred , paid or payable, whether by Landlord, Landlord's managing agent or others on behalf of Landlord during each twelve (12) month period selected by Landlord for operating, managing, administering, equipping, protecting, policing, lighting, maintaining, insuring, repairing, replacing, painting and improving the Shopping Center and the Common Areas and their facilities. The items and charges comprising Operating Expenses shall specifically include, without limitation, gardening and landscaping, the cost of commercial general liability, property damage, wind storm and other insurance carried by Landlord in its sole discretion and at premiums deemed reasonable by Landlord in the circumstances, all building, parking lot and Shopping Center repairs, line painting, paving, patching and resurfacing, lighting (including electric cost and maintenance, repair or replacement of fixtures, poles and replacement of bulbs), roof repairs, irrigation and fertilization, drainage and controlling of puddling or flooding, interior and exterior pest control, fire monitoring and prevention, electricity, sewer and water, and all other utilities allocable to the Shopping Center, sign repair and maintenance, Shopping Center advertising, music systems, sanitary control, security or other personnel retained to direct parking and to police the Common Areas (if such equipment and personnel are employed, which decision shall be in Landlord's sole discretion), removal of water, snow, ice, trash, rubbish, garbage and other refuse from the Shopping Center and Common Areas, wages, health and welfare benefits and other benefits, payable to or in connection with on-site management, administration and other personnel, and/or an equitable allocation of the wages, health and welfare benefits and other benefits, payable to or in connection with off-site personnel where they are employed to provide services to the Shopping Center together with other properties, as well as travel and other expenses related thereto and any other associated costs thereof, permits and licenses related to the operation of the Shopping Center, the purchase and/or rental of equipment, signs and supplies; the depreciation or amortization of the costs and expenses, including without duplication, the cost of initial supply and installation and the repair and replacement of all machinery, equipment, meters and other fixtures, equipment and facilities, including sprinkler and irrigation systems, serving or comprising the Shopping Center which by their nature require periodic or substantial repair or replacement, unless, pursuant to any other provision of this subsection, they are charged fully in the year in which they are incurred, in accordance with sound accounting principles, taxes or fees payable by Landlord for any pylons, equipment or other facilities, depreciation on machinery and equipment used in such maintenance, the amortized portion of any items of a capital nature (which amortization shall be over the useful life of such item, as determined in accordance with generally accepted accounting principals), janitorial services for the Shopping Center, service and maintenance agreements for the Shopping Center and Common Areas, and a management fee (which shall not exceed five percent (5%) of the aggregate minimum and percentage rents payable by occupants of the Shopping Center) representing the cost to Landlord of personnel or third parties necessary or convenient to implement the services specified in this Lease, whether such personnel are employed at the Shopping Center or not. In addition to the Expenses set forth above, Landlord shall also be entitled to charge an administrative fee not to exceed 15% of the total Operating Expenses for the Shopping Center. Landlord shall have the right with regard to any and all management and maintenance obligations of Landlord under this Lease, to contract with such person(s) or entity or entities for the performance and accomplishment of such of the obligations as Landlord shall deem proper, including entities in which Landlord may hold an ownership or other interest. Notwithstanding anything contained in this Lease, Landlord shall be under no obligation to provide security personnel for the Shopping Center, and to the extent such services are provided Landlord shall not be responsible, does not warrant the sufficiency of and shall not be responsible for any and all claims, liabilities, costs and expenses and the like which arise therefrom, all of which Tenant expressly waives. The cost and expense of providing such personnel shall be included in Operating Expenses.

(E)   Payment of Operating Expenses.   As additional and other Rent for each year of this Lease, Tenant shall pay to Landlord on the first day of each month in advance commencing on the Rent Commencement Date, one-twelfth (1/12th) of Tenant's Proportionate Share (as defined in Article 1) of the Operating Expenses, which costs shall be based upon Landlord's estimates. Tenant's Proportionate Share of the Operating Expense shall be prorated for any partial calendar month during the Lease Term.

(F)   Reconciliation.   Within a reasonable time after the end of each Lease Year, or other accounting period as determined by Landlord, Landlord shall furnish to Tenant a statement of the actual Operating Expenses for the preceding calendar year. If the statement shows that the aggregate of Tenant's monthly installments of

Operating Expenses paid by Tenant during such year was less than the actual amount due, Tenant shall pay the balance due to Landlord within twenty (20) days after receipt of the statement. If such statement shows that the aggregate amount paid by Tenant for such year exceeds the actual amount, such excess shall be applied by Landlord to the next monthly installment(s) due (or shall be refunded to Tenant if there shall be no further monthly installments due). Tenant's failure to give Landlord written notice to any objection to the statement within sixty (60) days after the statement is sent shall constitute a waiver of any objection or inquiry Tenant may have about the statement or for any examination of Landlord's records, and such statement(s) shall be conclusively deemed to be correct as between the parties. Tenant covenants and agrees that Tenant shall remain liable for and shall pay its Proportionate Share of the year-end reconciliation of Operating Expenses owed by Tenant and payable for the Lease Term hereunder, notwithstanding the expiration or earlier termination of this Lease.

7.    Operation of the Shopping Center; Relocation.

(A)    The Shopping Center is, and shall at all times be, subject to the exclusive control, management and operation of Landlord. Landlord expressly reserves the right at any time, and from time to time to (i) enlarge, remove, reduce, reconfigure, make alterations to or add to, and to build additional stories on, the building in which the Leased Premises is located or other buildings within the Shopping Center; (ii) construct other buildings and improvements in the Shopping Center, including any modifications of the Common Areas in connection therewith; (iii) enclose any mall; (iv) enlarge or reduce the Shopping Center; (v) add, relocate or remove Shopping Center parking areas; (vi) sell or lease any part of the land comprising the Shopping Center; (vii) obstruct or close off all or any part of the Shopping Center for the purpose of maintenance, repair or construction; (viii) change the identity and type of stores and tenancies and the dimensions thereof; (ix) change the name of the Shopping Center; (x) change the address or designation of the Leased Premises; (xi) convert common areas into leasable areas or premises; and (xii) change the means of access to and egress from the Shopping Center and/or the Leased Premises. Tenant hereby consents to the exercise by Landlord of the rights set forth in this Article 7 (A) and agrees that the exercise of such rights by Landlord shall not diminish Tenant's obligations under this Lease and shall not be deemed to constitute and eviction or disturbance of Tenant's use and possession of the Leased Premises and shall not entitle Tenant to any set off or abatement of Rent or any other claim. In the exercise of its rights under this Article 7 (A), the Landlord will use its commercially reasonable efforts to ensure that traffic ingress and egress to and from the Leased Premises is not unreasonably interfered with, and Landlord will proceed as expeditiously as reasonably possible to complete its work and other activities so as to minimize interference with the Tenant's business.

(B)    Landlord expressly reserves the right to diminish, alter, relocate or rearrange (collectively, a "Relocation") the Leased Premises from that shown on Exhibit "A". If the Landlord elects to relocate the Leased Premises at any time after the Tenant has opened for business, then the Landlord will give the Tenant not less than thirty (30) days' prior written notice of such Relocation ("Relocation Notice") and agrees to pay the Tenant all reasonable third party out-of-pocket moving expenses directly incurred by the Tenant in connection with the Relocation and to provide the Tenant with new premises in the same or similar state of condition in which the Leased Premises were delivered by the Landlord to the Tenant on initial occupancy of the Leased Premises. If the Relocation occurs during the Initial Term, the Landlord will, in addition, construct tenant improvements in the new premises substantially similar in quality and finish to those existing in the Leased Premises at the date of the Landlord's Relocation Notice (except for Tenant's trade fixtures, furniture and equipment), otherwise the responsibility will be the Tenant's. The Landlord's Relocation Notice will specify the proposed new location and configuration for the Leased Premises ("Relocated Premises"). If the Tenant does not accept the Relocated Premises, then it will send written notice to that effect within fifteen (15) days after receipt of the Relocation Notice. If no such written notice is received by the Landlord within the fifteen (15) day period, the Tenant will be deemed to have accepted the Relocated Premises. If the Landlord receives the Tenant's written notice (objecting to the Relocated Premises) within such fifteen (15) day period, the Landlord will have the right to either terminate this Lease on not less than sixty (60) days written notice to the Tenant, or alternatively, to withdraw the Relocation Notice.

8.    Construction and Condition of Leased Premises; Tenant's Work and Landlord's Work.

(A)    Tenant's Work. Promptly following the Commencement Date, Tenant shall, at its sole cost and expense, (subject to the provisions of Article 10, Exhibit "E", the rules and regulations as may be adopted by Landlord from time to time, and all other relevant provisions of this Lease) fixture and do all other work in order to prepare the Leased Premises for business operation, and complete its work, fully staff and stock its store, and open for business no later than the Rent Commencement Date. Prior to opening for business from the Leased Premises or otherwise commencing operations from the Leased Premises, Tenant shall obtain a permanent certificate of occupancy (or local equivalent) for the Leased Premises from the local government agency having jurisdiction, and obtain final lien waivers for all work performed by or on behalf of Tenant and forward copies to Landlord. Tenant shall, at its sole expense, in doing any work, making any installations, or in using, occupying or conducting business at the Leased Premises, comply with all present and future: laws, regulations, ordinances, building codes and/or fire codes, including the ADA, that are applicable to the Leased Premises or to Tenant's use or occupancy or business operations, including those that relate to installation, maintenance, upgrading, repair or replacement of sprinkler systems, and Tenant shall defend, indemnify and hold Landlord harmless from all losses, damages, claims, liabilities, costs and expenses (including reasonable legal fees) arising out of any failure to do so. Tenant acknowledges that neither Landlord nor Landlord's employees, agents or contractors have made any representations or warranties as to the condition of the Leased Premises or the suitability for the conduct of Tenant's business, and that Tenant's determination of the suitability of the Leased Premises for its intended purposes is based solely on its own inspections, and not based on any representation or warranty of Landlord, its agents, brokers or employees, and Tenant accepts the Leased Premises and all the equipment, apparatus, plumbing, heating, air conditioning, electric, water, waste disposal and other systems relating thereto in absolutely "AS IS," "WHERE-IS" condition, with any and all existing defects and faults and subject to all applicable zoning, municipal, county and state laws, ordinances and regulations governing and regulating the use of the Leased Premises, and without any representation or warranty by Landlord as to (i) merchantability, (ii) habitability, (iii) fitness for Tenant's intended purposes or any other particular purpose, (iv) absence or presence of any structural or other defects or deficiencies in the Leased Premises or the Shopping Center, or (v) the condition or state of repair of the Leased Premises or Shopping Center, and Tenant agrees to accept this Lease subject thereto. Anything in this Lease to the contrary notwithstanding, Landlord does not warrant the compliance of the Leased Premises with the Americans with Disabilities Act or such state or local laws as relates to Tenant's proposed use or occupancy of the Leased Premises, or as relates to any alterations, additions or improvements made, or proposed to be made, therein by Tenant, or otherwise.

(B)   Landlord's Work.  Except as specifically set forth in Exhibit "B", Landlord is not obligated with respect to either the Leased Premises or the Shopping Center to make any improvements, changes, installations, do any work, make any alterations, repairs or replacements, clean out the Leased Premises, obtain any permits, licenses or governmental approvals, or spend any money either to put Tenant in possession or to permit Tenant to open for business and Tenant accepts the Leased Premises "AS-IS". All work (other than that to be performed by Landlord as specifically set forth on Exhibit "B", if any) shall be accomplished by Tenant.   Except for signs, merchandise counters or other easily removable similar trade fixtures installed by Tenant at Tenant's expense, all alterations, decorations, additions and improvements made by Tenant to the Leased Premises and including all heating and air-conditioning units, equipment and apparatus at the Leased Premises and other fixtures such as ceiling tiles and grids, lighting fixtures, electric panel boxes, plumbing, boilers, floor and wall coverings, alarm systems, lights, toilet fixtures, partitions, doors and utilities shall be deemed attached to the freehold and be Landlord's property.

9.      Utilities:  Tenant shall provide and pay for its own heat, air conditioning, water, gas, electricity, sewer, sprinklers, telephone, cable or other communication services and other utilities, including application deposits and installation charges for meters and for consumption or use of utilities. If Tenant receives utilities through a meter which supplies utilities to other tenants, Tenant will pay to Landlord Tenant's proportionate share (based on the relative square footage of the Leased Premises) of the total meter charges within ten (10) days after invoice from Landlord. Landlord shall notify Tenant of the procedures for removal of trash from the Leased Premises and Tenant shall be responsible for all costs and expenses associated with same. All such removal shall be completed in strict accordance with all local governmental requirements.  Tenant shall be responsible for, and shall pay all connection fees, tap fees, meter fees, hook-up fees, water and sewer impact fees and water and sewer development and resource fees which may be levied or assessed against the Leased Premises or any part thereof before or after the Commencement Date or otherwise in respect of Tenant's occupancy of the Leased Premises. Landlord shall not be liable in damages or otherwise for any loss, damage or expense that Tenant may sustain or incur by reason of any change, failure, interference, interruption or defect in the utility services provided to the Leased Premises.  No such change, failure, interference, interruption or defect shall entitle Tenant to terminate this Lease or abate the payments Tenant is required to make under this Lease. Tenant shall indemnify and defend Landlord from and against all losses, claims, actions, damages, costs, fines, penalties, interest and expenses (including reasonable attorney's fees and court costs) incurred or sustained by Landlord as a result of the failure by Tenant to pay the fees and charges described in this Section as when and in the manner due and payable.

10.     Repairs and Alterations.
        (A)   Landlord's Repairs and Maintenance.  Landlord agrees to repair and maintain in good order and condition, ordinary wear and tear excepted, the foundation, roof, roof drains, the exterior of the perimeter demising walls, and the load-bearing structural columns and beams in the Leased Premises, except that if such repairs or replacements arise from (i) repairs, installations, alterations, or improvements by or for Tenant or any subtenant, concessionaires, or their respective employees, agents, invitees, licensees or contractors, or (ii) any act, omission or negligence of Tenant or any subtenant, concessionaires, or their respective employees, agents, invitees, licensees or contractors, or (iii) default under the Lease by Tenant, then Tenant shall make such repairs or replacements or, if Landlord elects, Landlord may perform the work for Tenant's account and Tenant shall reimburse Landlord for expenses incurred plus overhead and interest as set forth in subsection (C) below. Landlord shall not be required to commence any such repair until ten (10) days after receipt of written notice from Tenant that the same is necessary. The provisions of this paragraph shall not apply in the case of damage or destruction by fire or other casualty or a taking under the power of eminent domain, in which events the obligations of the Landlord shall be controlled by the Articles of this Lease dealing therewith. Landlord shall not be liable for any damage caused by Landlord's failure to repair unless and until Landlord has had reasonable opportunity to perform such repair after receipt of written notice from Tenant as to the need for such repair. Tenant waives the provision of any law, or any right Tenant may have under common law, permitting Tenant to make repairs at Landlord's expense.

        (B)   Tenant's Repairs and Maintenance.  Except as provided in subsection (A) above, all other portions of the Leased Premises shall be kept in good repair, condition and appearance by Tenant. Tenant shall maintain and make all repairs, replacements and alterations of every kind with respect to the Leased Premises to keep it in good condition, including the storefront, glass, all interior and exterior doors, signs, ceilings, interior walls, interior side of perimeter walls, floor, floor coverings, plumbing, electric, heating and air conditioning and all duct(s), vent(s), exhaust(s) and roof curbing and flashing associated with same, sprinklers and lighting fixtures, and other non-structural interior portions of the Leased Premises, and do all repairs required by any laws, ordinances or requirements of public authorities. Beginning at the point from which they serve the Leased Premises exclusively, whether located inside or outside, Tenant shall make all repairs, replacements and alterations necessary to maintain in good condition all lines, apparatus, ducts, and equipment relating to utilities (including heating, air conditioning, water, gas, electricity and sewerage). At all times during the Lease, Tenant shall maintain a monthly pest control contract and a service contract with a reputable air conditioning repair firm, fully licensed to repair air conditioning units in the state where the Shopping Center is located, for the monthly maintenance of the heating, ventilating and air conditioning ("HVAC") system servicing the Leased Premises, which firm shall regularly service and inspect the air conditioning unit(s) on the Leased Premises. Landlord shall have the right at any time during the Lease Term to approve or disapprove the HVAC contractor used by Tenant and to require Tenant to use only an air conditioning firm approved by Landlord.  If Tenant shall fail to enter into or to maintain in full force and effect or to pay for such contract, then, at Landlord's option, Tenant shall be in default hereunder and Landlord shall have the right in addition, and without prejudice to all other rights and remedies available to Landlord, to contract for such services on Tenant's behalf and to pay any sums due to maintain such contract in force, and Tenant shall be obligated, forthwith upon demand, to pay to Landlord as Additional Rent the total sum of expenses so incurred by Landlord plus interest thereon from the date of payment at the Default Interest Rate. Tenant's sole right of recovery shall be against Tenant's insurers for loss or damage to stock, furniture and fixtures, equipment, improvements and betterments. Tenant shall also keep the sidewalks and the area immediately in front of the Leased Premises and the delivery area immediately in the rear of the Leased Premises clean and free from dirt and rubbish.  All parts of the interior of the Leased Premises, including the storefront, shall be painted or otherwise decorated and refurbished (including, but not limited to, floor covering and wall covering) by Tenant as and when reasonably necessary, but at least once every five (5) years following the Commencement Date.

In the event Tenant's HVAC unit requires replacement during the initial Term of this Lease, Landlord and Tenant hereby agree that the cost and expense of such replacement shall be divided equally between Landlord and Tenant, but in no event shall Landlord's obligation exceed the sum of Ten Thousand and 00/100 Dollars ($10,000.00) (the "HVAC Allowance"). Landlord shall not be responsible for normal wear and tear on the existing HVAC or on any replacement unit, including coils, fans, belts, and conventional cleaning. Upon replacement, Landlord shall be relieved of and from all further obligations with respect to the HVAC unit. Notwithstanding anything herein to the contrary, Landlord shall be relieved of the obligations set forth herein if Tenant shall fail to obtain and continuously maintain a quarterly HVAC maintenance system service agreement, acceptable to Landlord throughout the initial Term.

(C)    Failure to Repair. If Tenant refuses or neglects to repair properly as required hereunder and to the reasonable satisfaction of Landlord, or its representative, as soon as reasonably possible after demand, Landlord, or its representative, may make such repairs without liability to Tenant for any loss or damage that may occur to Tenant's merchandise, fixtures, or other property, or to Tenant's business by reason thereof, and upon completion thereof, Tenant shall pay as additional and other Rent Landlord's cost for making such repairs plus twenty (20%) percent for overhead and interest at the Default Interest Rate as defined herein from the date Tenant is notified of the completion of repairs by Landlord. In the event that Landlord shall undertake any maintenance or repair in the course of which it shall be determined that such maintenance or repair work was made necessary by the negligence or willful act of Tenant or any of its employees or agents or that the maintenance or repair is, under the terms of this Lease, the responsibility of Tenant, Tenant shall pay Landlord's costs therefor plus overhead and interest as above provided in this Section.

(D)    Alterations. At the end of the Term of this Lease, Tenant shall deliver the Leased Premises to Landlord in good repair and condition, reasonable wear and tear arising from Tenant's Permitted Use of the Leased Premises as specified herein excepted. No alterations, installations, additions or improvements will be made to the Leased Premises by Tenant without Landlord's prior written approval. Notwithstanding the foregoing, Tenant may make in a first-class manner such non-structural interior alterations to the Leased Premises as Tenant may deem necessary or desirable in connection with operation of its business in the Leased Premises so long as such alterations do not interfere with or otherwise effect any HVAC, plumbing, security, fire detection and protection or utility systems, except those installed by Tenant or exclusively serving the Leased Premises. All such permitted alterations shall comply with applicable insurance requirements and governmental laws, and with all provisions of this Lease, and conform with the specification set forth in Exhibit "E". All installations, alterations, additions and improvements, whether by Landlord, Tenant or any other person (except only sign panels and movable furnishings, equipment and trade fixtures installed at Tenant's cost) shall become, when made, a part of Landlord's real estate, and on termination of the Lease Term shall be surrendered with the Leased Premises in good condition. Tenant shall not have the right to remove sign boxes affixed to the exterior of the Leased Premises. Tenant shall defend, indemnify and save Landlord harmless from and against all claims for injury, loss or damage to person or property caused by or resulting from doing any work. For any work approved by Landlord that involves penetration of the roof surface, Tenant shall provide Landlord prior written notice and if requested by Landlord, shall employ Landlord's contractor.

(E)    Permits; Liens. All repairs, installations, alterations, improvements and removals by Tenant will be done in a good and workmanlike manner, only after Tenant has procured all required permits. Tenant shall comply with all laws, ordinances and regulations of public authorities and with all Landlord's and Tenant's insurance requirements and with insurance inspection or rating bureaus; and the work shall not adversely affect the structure of the building. Tenant shall pay promptly when due all charges for labor and materials in connection with any work done by or for Tenant or anyone claiming under Tenant. Tenant shall remove, by payment, bonding or otherwise, within ten (10) days after notice, all liens placed on the public record or in any way against Landlord's interest or the Shopping Center resulting from any act of Tenant or from labor or materials being alleged to have been supplied at the request of Tenant or anyone claiming under Tenant, failing which Landlord may remove such lien and collect all expenses incurred from Tenant as additional and other Rent, including an administrative fee of Twenty Percent (20%) of the amount of the lien. Tenant shall protect, defend, save harmless and indemnify Landlord and any fee owner of the Shopping Center from and against all losses, claims, liabilities, injuries, expenses (including legal fees), lawsuits and damages arising out of any lien described above. NOTICE IS HEREBY GIVEN THAT LANDLORD IS NOT AND SHALL NOT BE LIABLE FOR ANY LABOR, SERVICES, MATERIALS FURNISHED OR TO BE FURNISHED TO TENANT OR TO ANYONE HOLDING THE LEASED PREMISES OR ANY PART THEREOF, AND THAT NO CONSTRUCTION OR OTHER LIEN FOR ANY SUCH LABOR, SERVICES OR MATERIALS SHALL ATTACH TO OR AFFECT THE INTEREST OF LANDLORD IN AND TO THE LEASED PREMISES OR THE SHOPPING CENTER. ALL MATERIALMEN, CONTRACTORS, LABORERS, OR OTHER PERSONS FURNISHING ANY SERVICES OR MATERIALS TO TENANT ARE HEREBY NOTIFIED THAT THEY MUST LOOK EXCLUSIVELY TO TENANT TO OBTAIN PAYMENT FOR SAME. TENANT SHALL DELIVER WRITTEN NOTICE OF THE PROVISIONS OF THIS SECTION TO ALL PERSONS PERFORMING WORK IN THE LEASED PREMISES. Pursuant to Florida Statutes 713.10, it is the intent of the parties hereto that Landlord's interest in the Leased Premises shall not be subject to any liens filed because of or arising from Tenant's failure to make payments in connection with any buildings or improvements installed or constructed on the Leased Premises. Nothing contained in this Lease shall be construed to confer upon any party, including without limitation, materialmen and contractors, the right to file a mechanic's or materialmen's lien or other lien or any claim related thereto, nor to perform any labor or to furnish any materials for the account of Landlord in respect to the construction of any improvements, alterations or repairs to the Leased Premises or the Shopping Center by Tenant, its employees, agents or contractors.

(F)    Exhaust Maintenance. Tenant shall, at its sole cost and expense, cause all exhaust/intake vents and hood systems to be maintained on a monthly basis, or more frequently as may be needed. Said maintenance shall be performed by a qualified company recognized within its industry as reputable and approved by Landlord. For each kitchen hood exhaust fan in the Premises, prior to the opening of the Premises for business Tenant shall furnish and install a rooftop mounted exhaust hood fan with a grease containment system (collectively, the "Rooftop Equipment"). Each exhaust fan shall have a grease collecting pan around the perimeter base of the fan. Each pan shall have a changeable, grease-absorbing filter which must be replaced by Tenant as often as may be necessary to prevent any grease from coming into contact with the roof or any part of it. Each grease containment system must be sized and installed in accordance with the manufacturer's specifications. (Grease containment systems are available from various sources, including: Grease Guard Inc., 605 Church Road, Elgin, Illinois 1/800-284-8273 or Grease Hound, DGA Industries, Inc., 3895 Clearview Court, Gurnee, Illinois 1/800-2234222)

The listed manufacturers do not constitute an endorsement by Landlord or its property manager of the listed companies or their products.

Because of the health and/or safety risks which might result from Tenant's non-compliance with the foregoing obligations, Landlord and Tenant hereby specifically agree that any such failure on the part of Tenant to so comply therewith shall constitute a material event of default under this Lease with respect to which no notice or grace period shall be afforded or granted to Tenant, anything in Article 10(F) hereof to the contrary notwithstanding.

(G)     Interior Ventilation System.  Tenant shall, at its sole cost and expense, install, maintain and keep in continuous operation a "Negative Ventilation System" within the Leased Premises. Such system shall not allow odors to permeate adjoining spaces and shall ensure that the air quality within the Leased Premises meets all applicable health and safety codes. Tenant shall be required to obtain Landlord's written approval of the system and the proposed method of installation thereof prior to commencing with such installation.

Because of the health and/or safety risks which might result from Tenant's non-compliance with the foregoing obligations, Landlord and Tenant hereby specifically agree that any such failure on the part of Tenant to so comply therewith shall constitute a material event of default under this Lease with respect to which no notice or grace period shall be afforded or granted to Tenant, anything in Article 10(G) hereof to the contrary notwithstanding.

(H)     Grease Trap Maintenance.  Tenant shall fulfill the following requirements, at its sole cost and expense, and in compliance with Landlord's specifications:

(i)     grease traps of the size and type approved by Landlord shall be installed by Tenant, including but not limited to, in-ground grease interceptors and roof-mounted roof exhaust grease containment systems. Tenant shall clean such traps on a semi-annual basis, or as designated by Landlord and shall maintain such traps at all times in a clean and sanitary condition;

(ii)     Tenant shall have the filters in the hoods for food processing exhaust systems removed weekly and washed, and shall have the hoods, exhaust ducts and roof-mounted containment systems cleaned a minimum of once every six (6) months, or as designated by Landlord. Said maintenance shall be performed by a qualified company recognized within its industry as reputable and reasonably approved by Landlord. Upon request of Landlord, Tenant shall deliver an affidavit to Landlord from the company performing cleaning of the hoods, exhaust ducts and roof-mounted containment systems, stating that such work has been performed and stating the date of such cleaning;

(iii)     If gas is used in the Leased Premises, Tenant shall install a proper gas cut-off valve in the Leased Premises.

If Tenant shall at any time fail to perform any such maintenance, Landlord shall have the right (but not the obligation, to cause such maintenance to be performed, and the costs incurred by Landlord, plus twenty percent (20%) of such costs to cover Landlord's overhead and supervision expenses, shall be payable by Tenant upon demand by Landlord, as Additional Rent hereunder.  Additionally, if at any time grease shall infiltrate the sewer system, Tenant shall be billed the cost to repair and or clean the sewer lines and the amount so billed shall be payable upon Tenant's receipt of the bill, as Additional Rent hereunder.

Because of the health and/or safety risks which might result from Tenant's non-compliance with the foregoing obligations, Landlord and Tenant hereby specifically agree that any such failure on the part of Tenant to so comply therewith shall constitute a material event of default under this Lease with respect to which no notice or grace period shall be afforded or granted to Tenant, anything in Article 10(H) hereof to the contrary notwithstanding.

(I)     Trash Pick-up/ Dumpster.  Tenant shall provide, at its sole cost and expense, for the timely removal of its trash and rubbish, including the installation of any dumpster or other similar refuse collection devices.  In the event the trash pick-ups are insufficient for Tenant's Permitted Use, Landlord may require additional trash pick-ups. If Tenant should violate this provision, or otherwise fail to remove its trash or rubbish, the Landlord shall have the right to do so, and any cost incurred by Landlord, plus a twenty percent (20%) administrative fee, shall be promptly reimbursed by Tenant.

(J)     Nuisance.  Tenant shall, at Landlord's request and at Tenant's sole cost and expense, provide and install whatever devices, such as insulation, baffling, etc., that may be necessary to prevent any noise, odors, vibrations or water from extending beyond the Leased Premises to adjacent stores and/or Common Areas. Tenant will be responsible to repair in a timely manner, and in a good and workmanlike manner, any damage caused by noise, odors, vibrations or water extending beyond the Leased Premises or caused by the operation of Tenant's business and Tenant agrees to indemnify, defend and hold Landlord, its successors and assigns, harmless against any and all claims, actions, suits, proceedings, costs, expenses, damages and liabilities, including attorneys' fees, arising out of, connected with, or resulting therefrom.  If, within twenty (20) days after demand by Landlord to comply with any of the above requirements, Tenant does not commence and diligently prosecute to completion such work, Tenant shall be deemed to be in default. Tenant shall be responsible for pest control within the Leased Premises and in adjacent stores in the event Landlord determines that, in its sole discretion, infestations are emanating from Tenant's goods or business operations.

(K)     Rear Service Area/Walkway.  Tenant shall at all times monitor and ensure that no items used in Tenant's business shall accumulate or be placed alongside the Leased Premises, or the delivery area in the rear of the Leased Premises, which shall in the Landlord's judgment impede safe passage of the rear service corridor, or which shall violate present or future governmental ordinances.  Additionally, Tenant shall not keep house keeping items or trash cans behind the Leased Premises.

11.     Signs; Painting; Displays.  No advertising or signs of any kind may be placed by Tenant or anyone claiming under Tenant on the exterior of the Leased Premises or doors other than signs as set forth in Exhibit "C"

and small lettering on the door to the Leased Premises stating hours of operation. Tenant shall not utilize any banners, flashing, painted, neon or moving signs or lights without the prior written consent of Landlord. All interior signs shall be in strict compliance with all applicable laws, ordinances and regulations, and shall be professionally prepared and placed only on the interior of any windows. No signs will be placed on the exterior of any windows, doors or walls. Tenant shall not paint, decorate or mark any part of the exterior of the Leased Premises or interior of the windows of the Leased Premises. If an exterior sign panel is available on the fascia of the Leased Premises, Tenant shall, within thirty (30) days after the Rent Commencement Date, install an identification sign identifying Tenant's tradename, which sign shall be in accordance with Landlord's sign criteria, in compliance with applicable law and subject to Landlord's reasonable approval. Tenant shall remove its exterior signage at the end of the Lease Term and repair any damage caused by such removal; in the event Tenant does not do so, then Landlord may remove such signage (and repair any damage caused by such removal) at Tenant's expense and deduct the cost of the same from the Security Deposit.

Tenant shall continue to have the right to one sign panel on both sides of the Shopping Center pylon sign fronting SW 72nd Street, in the panel location as designated in Exhibit C-1 attached hereto and made a part hereof. Tenant, at its sole cost and expense, shall obtain all requisite approvals for, and shall manufacture and install said panel, and Tenant shall be responsible for the maintenance, repair and replacement of such panel.

12.   Indemnity; Insurance.

      (A)   Tenant shall protect, defend, save harmless and indemnify Landlord and any fee owner of the Shopping Center from and against all losses, claims, liabilities, injuries, expenses (including legal fees), lawsuits and damages of whatever nature either (i) claimed to have been caused by or resulted from any act, omission or negligence of Tenant or its subtenants, concessionaires, employees, contractors and invitees no matter where occurring or in any manner growing out of or connected with the use, non-use, condition or occupation of the Leased Premises, (ii) occurring in the Leased Premises or the sidewalk immediately in front of the Leased Premises, (iii) any violation of any agreement or condition of this Lease, and (iv) violation by Tenant of any contract or agreement to which Tenant is a party or any restriction, statute, law or regulation, in each case affecting the Leased Premises or any part thereof, except if caused by the gross negligence or willful misconduct of Landlord, its agents or employees. Landlord shall not be liable under any circumstances for any injury or any loss or damage to or interference with any merchandise, equipment, fixtures, furniture, furnishings or other personal property or the business operations of Tenant or anyone in the Leased Premises occasioned by (i) the act or omission or negligence of persons occupying other premises, or (ii) any defect, latent or otherwise, in any building or the equipment, machinery, utilities, wiring, plumbing or apparatus, or (iii) any breakage or leakage of the roof, walls, floor, pipes or equipment, or (iv) any backing up, seepage or overflow of water or sewerage, or (v) flood, rain, snowfall, wind, earth movement or other elements or Acts of God.

      (B)   Tenant's Insurance.   Tenant shall maintain with financially responsible insurance companies with a Best Rating of not less than A VIII licensed to do business in the state where the Shopping Center is located: (i) a commercial general public liability insurance policy with respect to the Leased Premises and its appurtenances (including signs) with a limit of not less than One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) in the general aggregate; (ii) an all-risk ("special form") property insurance policy for no less than One Hundred Percent (100%) of the full replacement cost of the covered property insuring all merchandise, leasehold improvements, furniture, fixtures and other personal property, all at their replacement cost; (iii) business interruption insurance with limits of liability representing loss of at least approximately twelve (12) months of income; (iv) plate glass insurance covering all the plate glass of the Leased Premises, in amounts satisfactory to Landlord (or Tenant may elect to self-insure for plate glass); (v) worker's compensation and employer's liability insurance in compliance with applicable legal requirements; (vi) builder's risk insurance during the course of any construction; and (vii) any other form of insurance which Landlord or any mortgagee of the Leased Premises shall reasonably require from time to time, in form, in amounts and for risks against which a prudent tenant would insure. If the Permitted Use of the Leased Premises set forth in Article 1 includes the sale of alcoholic beverages, the policy of commercial general liability insurance specified in this Article 12 (B) shall include coverage for employer's liability, host liquor liability, liquor liability and so-called "dram shop" liability coverage with a combined single limit of not less than Three Million and 00/100 Dollars ($3,000,000.00) per occurrence. Any insurance policies required hereunder shall have terms of not less than one (1) year and shall provide that the policies may not be modified or terminated without thirty (30) days advance notice to Landlord. In addition, Landlord shall be named as an additional insured. Tenant shall deliver these insurance policies or certificates thereof, satisfactory to Landlord, issued by the insurance company to Landlord with premiums prepaid upon the signing of this Lease and thereafter at least thirty (30) days prior to each expiring policy or at any point upon Landlord's written request. Tenant's failure to deliver the policies or certificates specified hereunder shall constitute a default. If Tenant defaults in its obligation to obtain and deliver to Landlord the policy or certificate for any such insurance or if Tenant fails at any point during the Lease Term to maintain any such insurance, (1) Landlord shall have the right but not the obligation to procure same on account of Tenant and charge Tenant for all costs thereof as other Rent; and (2) Tenant shall indemnify and hold Landlord and Landlord's agents harmless from and against any loss, cost, damage, liability or expense (including attorneys' fees and disbursements) which is determined, in Landlord's reasonable discretion, to be a loss that otherwise would have been covered in whole or in part by Tenant's Insurance.

      (C)   Increase in Fire Insurance Premium.   Tenant agrees that it will not keep, use, sell or offer for sale in or upon the Leased Premises any article which may be prohibited by the standard form of fire and extended risk insurance policy. Tenant agrees to pay any increase in premiums for fire and extended coverage insurance that may be charged during the Term of this Lease on the amount of such insurance which may be carried by Landlord on the Leased Premises or the building of which it is a part, resulting from the type of merchandise sold by Tenant in the Leased Premises or resulting from Tenant's use of the Leased Premises, whether or not Landlord has consented to the same.

      (D)   Loss and Damage of Tenant's Property.   Landlord shall not be liable for any damage to property of Tenant or of others located on the Leased Premises, nor for the loss of or damage to any property of Tenant or of others by theft or otherwise. All property of Tenant or of others kept or stored on the Leased Premises shall be so kept or stored at the risk of Tenant only, and Tenant shall hold Landlord harmless from any claims arising out of damage to the same, including subrogation claims by Tenant's insurance carrier, unless such damage shall be caused by the gross negligence or willful misconduct of the Landlord or its employees or agents.

13.    Access to Leased Premises.  Landlord shall have the right (but shall not be obligated) to enter the Leased Premises at all times upon reasonable prior notice (and in case of emergency with no notice) to make any repairs, alterations, or improvements, including the installation or removal of pipes, wires and other conduits serving other parts of the Shopping Center or to inspect or to show the Leased Premises to prospective purchasers or mortgagees. Commencing six (6) months prior to expiration of the Lease Term, Landlord may enter the Leased Premises pursuant to the terms hereof to show the Leased Premises to prospective tenants and/or to maintain "For Rent" signs on the front or any other part of the exterior of the Leased Premises, and Tenant agrees that Tenant shall not interfere with or remove such signs. Landlord further reserves to itself the exclusive right at any time to use the roof, foundation or exterior walls (other than Tenant's storefront) for placing of signs or equipment or for the purpose of additional construction.

14.    Fire or Other Casualty.
        (A)    Notice.  Tenant shall give prompt notice to Landlord in case of fire or other damage to the Leased Premises.

        (B)    Termination.  If (i) the Shopping Center buildings are damaged to the extent of more than twenty-five (25%) percent of the replacement cost, or (ii) such damage results from a cause not insured, or (iii) the cost of repair or restoration exceeds the amount of insurance proceeds received by Landlord and available for restoration of the Leased Premises, or (iv) any leasable premises with a Gross Leasable Floor Area in excess of 25,000 square feet shall be damaged or destroyed by fire or other cause, or (v) the Leased Premises are damaged to the extent of more than fifty percent (50%) of the replacement cost (as determined by a reputable contractor selected by Landlord), or (vi) the Leased Premises are damaged and Tenant is not operating for business as required by Article 3(B) at the time the damage occurs, or (vii) the Leased Premises are damaged and less than one (1) year of the Lease Term remains unexpired at the time of the fire or other casualty; then in any of such events, Landlord may terminate this Lease by notice to Tenant within one hundred eighty (180) days after such event, and on the date specified in the notice this Lease shall terminate.

        (C)    Replacement of Leased Premises.  If this Lease is not terminated by Landlord as aforesaid, this Lease shall continue in full force and effect (Tenant waives any right conferred by any applicable law to terminate this Lease based on the damage), and Tenant shall promptly on notice from Landlord, remove its fixtures, other property and debris as required by Landlord, and then Landlord shall rebuild the Leased Premises to the condition existing when the Leased Premises was originally delivered to Tenant exclusive of any trade fixtures or improvements installed by Tenant (but only to the extent insurance proceeds are adequate and available for such purposes); and upon Landlord providing Tenant written notice of the completion thereof, Tenant shall restore Tenant's property and within sixty (60) days following Landlord's written notice of completion reopen for business. Tenant shall use the proceeds of any recovery on Tenant's insurance policies for restoration of improvements made by Tenant to the Leased Premises, and for restoration and/or replacement of Tenant's equipment, trade fixtures and inventory, and to cover any business interruption loss. If the damage, repair or rebuilding renders the Leased Premises wholly or partially untenantable, and so long as the casualty was not caused by Tenant, there shall be a fair and equitable proportionate abatement of all Rent from the date when the damage occurred until the date when the Leased Premises have been restored by Landlord based on the proportion of the Leased Premises rendered untenantable.

15.    Eminent Domain.
        (A)    Leased Premises Taken.  If the whole of the Leased Premises are taken in connection with eminent domain, the Lease Term shall expire when Landlord shall be divested of its title, and Rent shall be apportioned as of that date. If only part of the Leased Premises is taken in connection with eminent domain, and the Gross Leasable Floor Area of the Leased Premises is reduced by twenty-five percent (25%) or more, Landlord may terminate this Lease by giving written notice to Tenant within sixty (60) days after such taking, effective as of the date possession of the taken part shall be required for public use, and Rent shall be apportioned as of that date. Tenant shall not have any claim for an award based on the loss of its leasehold estate. If this Lease is not so terminated pursuant to this provision, then Landlord shall promptly  restore the portion lost in the taking exclusive of any trade fixtures or improvements installed by Tenant and provided that Landlord shall not be required to expend more on such restoration than an amount equal to the condemnation award received by Landlord (less all expenses, costs and legal fees incurred by Landlord in connection with such award) multiplied by a fraction the numerator of which is the number of square feet of the Gross Leasable Floor Area of the Leased Premises so taken and the denominator of which is the number of square feet of the Gross Leasable Floor Area of the Shopping Center so taken), and this Lease shall continue in full force and effect except that the Rent shall be reduced in proportion to the portion of the Leased Premises lost in the taking.

        (B)    Shopping Center Taken.  If any part of the Shopping Center is taken by condemnation so as to render, in Landlord's sole judgment, the remainder unsuitable for use as a retail shopping center, Landlord shall have the right to terminate this Lease, upon notice to Tenant, within 120 days after possession is taken by such condemnation. If Landlord terminates this Lease, it shall terminate as of the date set forth in Landlord's notice to Tenant, and Tenant shall pay Rent and perform all of its other obligations under this Lease up to such date with a proportionate refund by Landlord of any Rent which shall have been paid in advance for periods subsequent to such date.

        (C)    Damages.  Landlord shall be entitled to all damages in connection with eminent domain. Tenant shall execute any instrument required by Landlord for the recovery of damages and to remit to Landlord any damage proceeds recovered, except, however, Tenant may recover for itself damages for personal property or movable trade fixtures which were installed by Tenant, provided Landlord's award is not reduced thereby.

16.    Defaults and Remedies.
        (A)    Events of Default.  Any one of the following shall constitute an event of default by Tenant under this Lease (each an "Event of Default"): (1)  If Tenant fails to pay Security Deposit, Base Rent, Taxes, Operating Expenses, or other Rent or any other monetary amount as and when same becomes due; (2) If Tenant fails to perform or observe any other agreement or condition on its part to be performed or observed pursuant to this Lease, and fails to remedy same within twenty (20) days after written notice thereof is given by Landlord to Tenant (provided, however, in the case of any default referred to in this clause (2) which cannot be cured by the

payment of money and cannot with diligence be cured within such twenty (20) day period. If Tenant shall commence to cure the same within such twenty (20) day period and thereafter shall prosecute the curing of same with diligence and continuity, then the time within which such failure may be cured shall be extended for such period as may be necessary to complete the curing of the same with diligence and continuity not to exceed ninety (90) days); (3) If Tenant fails to perform or observe Tenant's obligations under Article 12 herein, and fails to remedy same within five (5) business days after written notice thereof is given by Landlord to Tenant; (4) If Tenant fails to cure, immediately after notice from Landlord, any Contamination (as defined below) or any hazardous condition which Tenant has created or suffered in violation of law or this Lease; (5) If Tenant defaults under any other lease or agreement between Tenant and Landlord or an affiliate of Landlord; (6) If Tenant's leasehold interest is levied on, attached or taken by any process of law; (7) If Tenant makes an assignment of its property for the benefit of creditors; (8) If any bankruptcy, insolvency or reorganization proceeding or arrangement with creditors (whether through court or by proposed composition with creditors) is commenced by or against Tenant or any guarantor of Tenant's obligations; (9) If a receiver or trustee is appointed for any of Tenant's property; (10) If this Lease is transferred to or devolves on, or the Leased Premises is occupied by, anyone other than Tenant except if specifically permitted by this Lease; or (11) If Tenant shall fail to open for business in the Leased Premises or if Tenant shall abandon, vacate or otherwise cease doing business at the Leased Premises for more than seven (7) consecutive Shopping Center business days (except for temporary closures due to casualty).

(B)     **Remedies.**  If an Event of Default described in subsection 16(A) occurs then Landlord or its agent shall have any or all of the following rights:

(i) To terminate this Lease by giving Tenant written notice specifying the day of termination (which shall be not less than five (5) days from the date of the notice), on which date this Lease and all of Tenant's rights will cease as a conditional limitation, as if that date specified in Landlord's notice was the original date for expiration of this Lease; but in all cases Tenant shall remain liable as hereinafter provided; and/or

(ii) To enter the Leased Premises and dispossess Tenant and all other occupants and their property by legal proceedings or otherwise without terminating this Lease, Tenant hereby waiving any claim it might have for trespass or conversion or other damages if Landlord exercises such remedy; and/or

(iii) To enter the Leased Premises and remove all or any part of the Tenant's property from the Leased Premises and without notice to Tenant sell same for the sole benefit of Landlord or store same in any public warehouse or elsewhere at the cost of, and for the account of Tenant, in which case the Landlord shall not be responsible for the care or safekeeping thereof whether in transport, storage or otherwise, Tenant hereby waiving any claim it might have for trespass or conversion or other damages if Landlord exercises such remedy; and/or

(iv) To, in the event of a breach or threatened breach of the Lease by Tenant, obtain an injunction against Tenant or invoke any remedy allowed at law or in equity; and/or

(v) To declare (a) all accrued Rent, and (b) the present value of all the aggregate Rent for the remaining balance of the Lease Term, to be immediately due and payable, and to recover immediately against Tenant all such Rent, including Base Rent, Percentage Rent (if any), Taxes, Operating Expenses and all other Rent, which amount shall be for the reasonable liquidated damages for default off this Lease and not a penalty. The present value of all the aggregate Rent for the remaining balance of the Lease Term shall be calculated with a discount factor of four percent (4%) per annum of the difference between (x) the entire amount of Base Rent, Percentage Rent (if any), all other Rent, charges and assessments which in Landlord's reasonable determination would become due and payable during the remainder of the Lease Term (in the absence of the termination of this Lease), and (y) the then fair market rental value of the Leased Premises for the remainder of the Lease Term; and/or

(vi) If Tenant fails to take possession of the Leased Premises or fails to open for business as provided in this Lease, or if Tenant vacates, abandons or deserts the Leased Premises, or if Tenant ceases to operate its business therein as provided in this Lease, then in any such event Landlord shall have, in addition to all other remedies available to Landlord, the right if permitted by law to additional Base Rent at the rate which is twenty-five percent (25%) of the then rate of Base Rent as elsewhere provided in this Lease for the period during which such failure of Tenant is continuing, but same shall not prevent Landlord from also treating such failure of Tenant as a default under this Lease and Landlord shall nevertheless have all of the rights and remedies provided in this Lease in the case of a default by Tenant. No contention of Landlord that Tenant has vacated, abandoned or deserted the Leased Premises will be defeated merely by reason of Tenant having left all or any part of its trade fixtures or other personal property in the Leased Premises; and/or

(vii) Landlord, with or without terminating this Lease, may immediately, or at any time thereafter, relet the Leased Premises or any part thereof for such term or terms (which may be for a term extending beyond the Lease Term), at such rental or rentals and upon such other terms and conditions as Landlord in its sole discretion may deem advisable, and Landlord may make any alterations, redecorations or repairs to the Leased Premises which it may deem reasonably necessary or proper to facilitate such reletting and Tenant shall pay all costs of such reletting including, but not limited to, the reasonable cost of any such alterations and repairs made to the Leased Premises, reasonable attorneys' fees and brokerage commissions related to obtaining possession and making a new lease with another tenant, free rent or concessions, lease assumptions and any other costs reasonably associated with reletting the Leased Premises. Landlord's refusal or failure to relet the Leased Premises shall not release or affect Tenant's liability hereunder and Landlord shall not be liable for failure or refusal to relet, or for failure to collect rent under such reletting. If this Lease will not have been terminated, Tenant shall continue to be liable as hereinafter provided.

Mention of any particular remedy shall not preclude Landlord from any other remedy in law or in equity.

(C)     **Re-Entry; Continuing Liability.**  No reentry or taking possession of the Leased Premises by Landlord or any other action taken by or on behalf of Landlord shall be construed to be an acceptance of a surrender of this Lease or an election by Landlord to terminate this Lease. Notwithstanding any re-entry, dispossession or termination

of the Lease by Landlord, Tenant will remain liable for damages to Landlord in an amount equal to the aggregate of all Rents and other charges required to be paid up to the time of such re-entry, dispossession or termination. In addition, may recover from Tenant all damages Landlord may suffer by reason of such default, including the cost of recovering the Leased Premises (which costs shall include, without limitation, court costs and reasonable attorneys' fees).

(D)    Failure of Performance by Tenant.  If Tenant shall default under this Lease, Landlord may, at its election, immediately or at any time thereafter, without waiving any claim for breach of agreement, and without notice to Tenant, cure such default or defaults for the account of Tenant, and the cost to Landlord thereof plus interest at the Default Interest Rate shall be deemed to be additional and other Rent and payable on demand.

(E)    Security Interest.  In addition to the other remedies set forth herein, in the event Tenant defaults hereunder, Tenant hereby grants to Landlord a lien and security interest on all property of Tenant now or hereafter placed in or upon the Leased Premises, and such property shall be and remain subject to such lien and security interest of Landlord for payment of all Rent and other sums agreed to be paid by Tenant herein. The provisions of this paragraph relating to such lien and security interest shall constitute a security agreement under and subject to the Uniform Commercial Code of the state in which the Shopping Center is located so that in the event Tenant is in Default hereunder Landlord shall have and may enforce a security interest on all property of Tenant now or hereafter placed in or on the Leased Premises, in addition to and cumulative of the Landlord's liens and rights provided by law or by the other terms and provisions of this Lease. Tenant hereby appoints Landlord as its attorney-in-fact to execute any financing statement (or continuation thereof) Landlord deems prudent to perfect the security interest granted hereby if Tenant does not timely execute as debtor such financing statement or statements and such other documents as Landlord may now or hereafter request in order to protect or further perfect Landlord's security interest.

(F)    Waiver.  Tenant hereby expressly, unconditionally and irrevocably waives all of the following: (a) any and all rights Tenant may have to interpose or assert any non-compulsory counterclaim or setoff in any action brought by Landlord based in whole or in part on nonpayment of Rent, even if such counterclaim or setoff is based on Landlord's alleged breach of a duty to repair or alleged breach of quiet enjoyment (Landlord and Tenant hereby stipulate and agree that any such counterclaim shall be severed and tried separately from the action brought by Landlord for nonpayment of Rent); (b) any and all rights Tenant may have to consequential damages incurred by Tenant, including but not limited to lost profits or interruption of business, as a result of any default by Landlord; and (c) any and all rights Tenant may have in the Leased Premises or any goods or personal property therein in the event Tenant is evicted and dispossessed of same.

(G)    Bankruptcy.  In the event (i) Tenant shall become a debtor under Chapter 7 of the Bankruptcy Code or (ii) a petition for reorganization or adjustment of debts is filed concerning Tenant under Chapter 11 or Chapter 13 of the Bankruptcy Code, or (iii) a proceeding is filed under Chapter 7 and is transferred to Chapter 11 or Chapter 13 then, in any such case, the trustee or Tenant, as debtor and as Debtor-in-Possession, shall, (x) within the statutory time, assume or reject this Lease, and (y) may not elect to assume this Lease, unless at the time of such assumption, the trustee or Tenant has cured or provided Landlord "Adequate Assurance" (as defined under bankruptcy law) and further provided that: (aa) within the time set forth in the Bankruptcy Code, the trustee or Tenant will cure all monetary defaults under this Lease and compensate Landlord for any actual pecuniary loss resulting from any existing default including, without limitation, Landlord's reasonable costs, expenses, accrued interest as set forth in the Lease, and actual attorneys' fees incurred as a result of the default and/or to enforce the terms hereof; (bb) within the time set forth in the Bankruptcy Code, the trustee or Tenant will cure all non-monetary defaults under this Lease; and (cc) the assumption will be subject to all of the provisions of this Lease.

For the purposes of this Section, Landlord and Tenant acknowledge that, in the context of the bankruptcy proceeding of Tenant, the Leased Premises is a leased real property within a shopping center. If the trustee or Tenant has assumed the Lease pursuant to the provisions of this Section for the purpose of assigning Tenant's interest hereunder to any other person or entity, such interest may be assigned only after the trustee, Tenant or proposed assignee has complied with all the terms, covenants and conditions of this Lease, including without limitation those with respect to Additional Rent and the use of the Leased Premises only as permitted in Section 1(A)(i) herein; Landlord and Tenant acknowledging that such terms, covenants and conditions are commercially reasonable in the context of a bankruptcy proceeding of Tenant. Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease on and after the date of such assignment. Any such assignee, shall upon request, execute and deliver to Landlord an instrument confirming such assignment and shall deposit a sum equal to three (3) months' rent and Additional Rent to be held by Landlord (without any allowance for interest thereon) to secure Tenant's future performance under the Lease.

17.    Subordination.
(A)    Subordination.  This Lease is and shall be subject and subordinate to (i) all ground or underlying leases and all mortgages or other security instruments now or hereafter affecting such leases, and (ii) all mortgages or other security instruments now or hereafter affecting the fee title of the Shopping Center, and (iii) all renewals, modifications, consolidations, replacements and extensions of any such ground or underlying leases and mortgages. In addition, Tenant shall not enter into, execute or deliver any financing agreement that can be considered as having priority to any mortgage or deed of trust that Landlord may have placed upon the Leased Premises. This clause shall be self-operative and no further instrument of subordination shall be required by any ground or underlying lessee or by any mortgagee. In confirmation of such subordination, Tenant agrees to execute promptly (but in no event later than ten (10) days after receipt of same) any instrument that Landlord or its mortgagee may reasonably request. However, at the option of Landlord or such mortgagee or ground lessor or secured party, this Lease shall be paramount to such mortgage or ground or underlying lease or other security instrument.

(B)    Attornment.  If Landlord transfers its interest in the Leased Premises, or proceedings are brought for foreclosure of any such mortgage or in case of sale in lieu thereof, or termination of any such ground or underlying lease, Tenant shall, if requested, attorn to the transferee, mortgagee, ground or underlying lessor and deliver, without charge, instruments acknowledging the attornment.

(C)    Notice and Right to Cure.  Provided Tenant was given notice in writing of the names and addresses to which the notices should be sent, Tenant shall give prompt written notice of any default by Landlord to the holder of all mortgages, ground or underlying leases and security holders if the default is such as to give Tenant a right to (i) terminate this Lease, or (ii) reduce the Rents or any other sums reserved, or (iii) credit or offset any amounts against Rents. Any mortgagee, ground lessor or security holder shall have the right to cure Landlord's default within sixty (60) days after receipt of Tenant's notice; and no such rights or remedies shall be exercised by Tenant until the expiration of said sixty (60) days (or such additional time reasonably required to cure such default).

18.    Waiver of Subrogation.  Notwithstanding anything to the contrary contained herein, Tenant hereby waives and releases all claims against Landlord, and against Landlord's agents and employees, for any loss or damage sustained by Tenant to the extent such claims are or could be insured against under any standard broad form policy of fire and extended coverage insurance, or under any fire and extended casualty insurance policy maintained by Tenant under this Lease, or required to be maintained by Tenant under this Lease, regardless of whether such policy is in effect at the time of the loss. Tenant will cause its insurance carriers to issue appropriate waiver of subrogation rights endorsements to all policies of insurance carried in connection with damage to the Leased Premises or any portions thereof or any personal property thereon; provided, however, that failure to obtain such endorsements shall not affect the release hereinabove given. Tenant will cause all other occupants of the Leased Premises claiming by, under or through Tenant to execute and deliver to Landlord a waiver of claims similar to the aforementioned waiver and to obtain such waiver of subrogation rights endorsements.

19.    Assignment or Subletting.

(A)    Landlord's Consent.  Tenant shall not assign, convey or otherwise transfer this Lease or any interest therein, either voluntarily or by operation of law or otherwise, or sublet the whole or any part of the Leased Premises, or permit occupancy by anyone else, without obtaining on each occasion Landlord's prior written consent, which consent Landlord shall not unreasonably withhold.  It shall not be unreasonable for Landlord to withhold consent to a proposed assignment or other transfer based upon a distinction in, by way of example only, the proposed assignor's or transferor's creditworthiness, national or regional reputation, intended use, or operating history from that of Tenant, or for any such similar business reason. The transfer of any corporate stock, partnership interest, membership interest or other interest in Tenant, or a merger, consolidation, acquisition or liquidation of or by Tenant, either voluntarily or by operation of law, shall be deemed an assignment and require Landlord's consent as stated above, except if Tenant is a public corporation and such transfer of stock is through a recognized stock exchange. In any assignment the assignee must assume this Lease in writing on Landlord's form. Any such assignment, conveyance, transfer or sublease made in violation of this Section shall be void.

(B)    Application.  In the event Tenant desires to assign this Lease or sublet or otherwise transfer the Leased Premises or any portion thereof, Tenant shall make written application to Landlord at least sixty (60) days prior to the proposed commencement date of such subletting or assignment, which application shall set forth the name and address of the proposed subtenant or assignee, the relevant terms of any sublease or assignment, a copy of the proposed sublease or assignment agreement, and copies of financial reports, business experience resume and other relevant financial information of the proposed subtenant or assignee which Landlord may reasonably require, including but not limited to tax returns, credit reports and details of operating history. At Landlord's option, any document evidencing the assignment, assumption and/or consent will be prepared by Landlord or its attorneys. Landlord shall have the right, as a condition of Landlord's consent to a proposed Transfer, to require (i) that the assignee provide the Landlord with an additional security deposit (in addition to any security deposits, advance rent or other sums or security then being held by the Landlord) in such amount as is determined by Landlord in its discretion, and/or (ii) that any or all shareholders or other principals of the assignee and their respective spouses enter into a guaranty agreement on Landlord's standard form, whereby such parties jointly and severally guarantee payment of all sums and performance of all other duties and obligations on the part of the Tenant and assignee to be paid and performed under this Lease, and/or (iii) that the Base Rent shall be increased to the current market rent rate.  Any request for Landlord's consent to assignment or subletting shall be accompanied by the non-refundable payment of an application fee ("Application Fee"), which shall be equal to Five Hundred Dollars ($500.00), to compensate Landlord for the costs and expenses to be incurred by Landlord in evaluating such assignment or subletting.  In the event Landlord consents to a transfer, Tenant shall pay to Landlord a Transfer Fee in the amount of Five Thousand and 00/100 Dollars ($5,000.00) as reimbursement to Landlord for its expenses in connection with the preparation and review of transfer related documents, provided, however, the $500 Application Fee shall be credited toward the Transfer Fee.  Notwithstanding the foregoing, in the event Tenant requests Landlord's consent to assign this Lease or sublet or otherwise transfer the Leased Premises or any portion thereof, Landlord shall have the right to cancel this Lease by written notice to Tenant within thirty (30) days after receipt of Tenant's written request for Landlord's consent thereto, which termination shall be effective not less than sixty (60) days after Tenant's receipt of such notice to terminate.

(C)    Continuing Liability.  Notwithstanding an assignment or subletting or occupancy of the Leased Premises by anyone other than Tenant, Tenant shall not be released (nor shall any of Tenant's constituents, partners, or members be released) from any obligations, liabilities or covenants under this Lease and shall continue to remain responsible. Landlord shall have the right to collect Rent from any assignee, subtenant or other occupant without releasing Tenant or waiving any right against Tenant for its default under this Article and without accepting the payor as a permitted tenant. In addition, Tenant shall pay to Landlord any positive difference between any rent or other amounts payable under any sublease or assignment to which Landlord grants its consent hereunder, and the Rent payable hereunder. Under any circumstances, Landlord shall not be liable for any money damages to Tenant or Tenant's proposed assignee, transferee or subtenant for Landlord to consent to any assignment or transfer of this Lease or transfer of Tenant's corporate stock or sale of Tenant's business or for refusal to consent to any subletting; Tenant's sole remedy shall be specific performance.

(D)    Encumbrance.  Neither this Lease nor the Term shall be mortgaged, pledged or encumbered, either voluntarily or by operation of law or otherwise, by Tenant, nor shall Tenant mortgage, pledge of encumber the interest of Tenant in and to any sublease of the Leased Premises or the rental payable thereunder, without the prior written consent of Landlord, which consent may be granted or withheld in the sole discretion of Landlord. Any such mortgage, pledge or encumbrance made in violation of this Section shall be void.

20.    Surrender and Holding Over.

(A)    Surrender.  At the expiration or sooner termination of the tenancy hereby created, Tenant shall peaceably leave and surrender the Leased Premises in broom-clean condition and the same condition as the Leased Premises were in upon delivery of possession thereof to Tenant, reasonable wear and tear excepted, and Tenant shall surrender all keys for the Leased Premises to Landlord and shall inform Landlord of all combinations on locks, safes and vaults (if any) in the Leased Premises. Prior to the expiration or sooner termination of this Lease, Tenant shall remove any and all trade fixtures, equipment, signage and other unattached items which Tenant may have installed, stored or left in the Leased Premises or elsewhere in the Shopping Center, and Tenant shall repair any damage caused by such removal. Notwithstanding the foregoing, Tenant shall not remove any plumbing or electrical fixtures or equipment, heating or air conditioning equipment, floor coverings (including but not limited to wall-to-wall carpeting), walls or ceilings, all of which shall be deemed to constitute a part of the freehold and/or leasehold interest of Landlord, nor shall Tenant remove any fixtures or machinery that were furnished or paid for by Landlord (whether initially installed or replaced). If Tenant shall fail to remove its trade fixtures or other property as provided in this Article 20(A), such fixtures and other property not removed by Tenant shall be deemed abandoned by Tenant and at the option of Landlord shall become the property of Landlord, or at Landlord's option may be removed by Landlord at Tenant's expense, or placed in storage at Tenant's expense, or sold or otherwise disposed of, in which event the proceeds of such sale or other disposition shall belong to Landlord. In the event Tenant does not remove its signage or make the repairs as required by this Article 20(A), Tenant shall be liable for and agrees to pay Landlord's costs and expenses in removing such signage and making such repairs (which sum may be deducted from the Security Deposit). Tenant's obligations and covenants under this Article 20(A) shall survive the expiration or termination of this Lease.

(B)    Holding Over.  The parties recognize and agree that the damage to Landlord resulting from any failure by Tenant timely to surrender possession of the Leased Premises as aforesaid will exceed the amount of the Base Rent therefore payable hereunder, and accurate measurement will be impossible. Tenant therefore agrees that if Tenant or anyone claiming under Tenant remains in possession of the Leased Premises after the expiration of the Lease Term, such party shall be a tenant at sufferance; and during such holding over, Base Rent and all items of other Rent shall be twice the rate which was in effect immediately prior to the Lease Term expiration, which Landlord may collect without admission that Tenant's estate is more than a tenancy of sufferance, and all the other provisions of this Lease shall apply insofar as the same are applicable. In the event Tenant holds over in the Leased Premises, then, whether or not Tenant is charged twice the Base Rent and other Rent as set forth herein, Tenant hereby relinquishes any right Tenant may have to receive a return of the Security Deposit at the end of such hold over period, and Tenant shall remain liable for all costs, expenses, claims, liabilities and damages of whatever kind and nature which arise from such holdover.

21.    Hazardous Materials; Mold.
(A)    Tenant shall indemnify, defend (with counsel reasonably acceptable to Landlord at all tribunal levels), protect, and hold harmless Landlord, its employees, agents, contractors, stockholders, officers, directors, successors and assigns from and against all claims, actions, suits, proceedings, judgments, losses, costs, personal injuries, damages, liabilities, deficiencies, fines, penalties, damages, attorneys' fees, consultants' fees, investigations, detoxifications, remediations, removals, and expenses of every type and nature, caused by either (i) the use, storage, transportation, release, disposal, discharge or emission of Hazardous Substances (defined herein) on or about the Leased Premises by Tenant or its agents, contractors, employees or those persons under Tenant's control (collectively, "Tenant's Agents") or (ii) Tenant's failure to comply with the provisions of this Article, or (iii) Tenant's or Tenant's Agents' failure to comply with any Environmental Laws. As used herein the term "Hazardous Substances" shall mean any material which could give rise to liability under (i) the Resources Conservation Recovery Act, as amended by the Hazardous and Solid Waste Amendments of 1984, as now or hereafter amended ("RCRA"), 42, U.S.C. Sections 6901 et seq.; (ii) the Comprehensive Environmental Response, Compensation and Liability Act, as amended by the Superfund Amendments and Reauthorization Act of 1986, as now or hereafter amended ("CERCLA"), 42, U.S.C. Sections 9601 et seq.; (iii) the Toxic Substances and Control Act, as now or hereafter amended ("TSCA"), 15 U.S.C. Sections 2601 et seq.; (iv) the Clean Air Act, as now or hereafter amended ("CAA"), 42, U.S.C. Sections 7401 et seq.; (v) any state or local statute, regulation or ordinance governing the generation, storage, use, disposition, release, clean-up or existence of hazardous substances or any regulations promulgated under any such statutes, as each of the foregoing may be amended from time to time; (vi) any common law theory based on trespass, nuisance or strict liability; or (vii) any other applicable law (collectively, the "Environmental Laws"). Tenant and/or Tenant's Agents not shall not bring any Hazardous Substances upon the Leased Premises, or otherwise use, generate, manufacture, refine, produce, process, store or dispose of under or about the Leased Premises, in any case in violation of Environmental Laws.

(B)    If at any time during the Term of this Lease, any emission, release or contamination ("Contamination") of the Leased Premises by Hazardous Substances shall occur, then, unless such Contamination shall have been caused by Landlord, its agents or employees, Tenant shall, at Tenant's sole cost and expense, and to the satisfaction of Landlord, promptly and diligently remove such Hazardous Substances from the Leased Premises or the groundwater underlying the Leased Premises in accordance with the requirements of the applicable Environmental Laws. However, Tenant shall not take any required remedial action in response to any Contamination in or about the Leased Premises or enter into any settlement agreement, consent, decree or other compromise in respect to any claims relating to any Contamination without first notifying Landlord of Tenant's intention to do so and affording Landlord the opportunity to appear, intervene or otherwise appropriately assert and protect Landlord's interests with respect thereto. In addition to all other rights and remedies of the Landlord hereunder, if Tenant does not promptly and diligently take all steps to prepare and obtain all necessary approvals of a remediation plan for any Contamination and thereafter commence the required remediation of any Hazardous Substances released or discharged in connection with any Contamination within thirty (30) days after Landlord has approved Tenant's remediation plan and all necessary approvals and consents have been obtained and thereafter continue to prosecute said remediation to completion in accordance with the approved remediation plan, then Landlord, at its sole discretion, shall have the right, but not the obligation, to cause said remediation to be accomplished, and Tenant shall reimburse, within fifteen (15) business days of demand for reimbursement, all amounts paid by Landlord (together with interest on said amounts at the highest lawful rate until paid), when said demand is accompanied by proof of payment of the amounts demanded. Tenant shall promptly deliver to Landlord copies of hazardous waste manifests reflecting the legal and proper disposal of all Hazardous Substances removed from the Leased Premises as part of Tenant's remediation of any Contamination.

(C)    Each party hereto (for purposes of this Article 21 (C), a "Notifying Party") shall immediately notify the other party (the "Notice Recipient") in writing of: (i) any enforcement, clean-up, removal or other governmental or regulatory action instituted, contemplated or threatened concerning the Leased Premises pursuant to any Environmental Laws; (ii) any claim made or threatened by any person against the Notifying Party or the Leased Premises relating to damage contribution, clean-up, cost recovery, compensation, loss or injury resulting from or claimed to result from any Hazardous Substances on or about the Leased Premises; and (iii) any reports made to any environmental agency arising out of or in connection with any Hazardous Substances pertaining to the Leased Premises or any alleged violation or liability with respect to Environmental Laws, including any complaints, notices, warnings or asserted violations in connection therewith, all upon receipt by the Notifying Party of actual knowledge of any of the foregoing matters. Notifying Party shall also supply to Notice Recipient as promptly as possible, and in any event within five (5) business days after Notifying Party first receives or sends the same, with copies of all claims, reports, complaints, notices, warning or asserted violations relating in any way to the Leased Premises.

(D)    Tenant, at its sole cost and expense, shall: (i) regularly monitor the Leased Premises for the presence of mold or for any conditions that reasonably can be expected to give rise to mold (the "Mold Conditions"), including, but not limited to, observed or suspected instances of water damage, mold growth, repeated complaints of respiratory ailment or eye irritation by Tenant's employees or any other occupants in the Leased Premises, or any notice from a governmental agency of complaints regarding the indoor air quality at the Leased Premises; and (ii) promptly notify Landlord in writing if it suspects mold or Mold Conditions at the Leased Premises.

(E)    In the event of suspected mold or Mold Conditions at the Leased Premises, Tenant, at its sole cost and expense, shall promptly cause an inspection of the Leased Premises to be conducted to determine if mold or Mold Conditions are present at the Leased Premises, and shall: (i) notify Landlord, in writing, at least five (5) business days prior to the inspection, of the date on which the inspection shall occur, and which portion of the Leased Premises shall be subject to the inspection; (ii) retain an industrial hygienist certified by the American Board of Industrial Hygienists ("CIH") or an otherwise qualified mold consultant (generally, "Mold Inspector") to conduct the inspection; and (iii) cause such Mold Inspector to:

(a)    Obtain and maintain errors and omissions insurance coverage with terms and limits customarily maintained by Mold Inspectors, adding Landlord as an additional insured with respect to Landlord's vicarious liability, and provide to Landlord evidence of such coverage and a copy of the endorsement granting Landlord additional insured status;

(b)    Perform the inspection in a manner that is strictly confidential and consistent with the duty of care exercised by a Mold Inspector; and

(c)    Prepare an inspection report, keep the results of the inspection report confidential, and promptly provide a copy to Landlord.

(F)    In the event the inspection required by subsection (E) above determines that mold or Mold Conditions are present at the Leased Premises, then, subject to subsection G below, Tenant, at its sole cost and expense, shall promptly: (i) hire trained and experienced mold remediation contractors to prepare a remediation plan and to remediate the mold or Mold Conditions at the Leased Premises; (ii) send Landlord a copy of the remediation plan, at least five (5) business days prior to the initiation of the mold remediation; and (iii) notify, in accordance with any applicable state or local health or safety requirements, its employees as well as occupants and visitors of the Leased Premises of the nature, location, and schedule for the planned mold remediation. All mold remediation shall be conducted in accordance with the relevant provisions of the document *Mold Remediation in Schools and Commercial Buildings* (EPA 402-K-01-001, March 2001) ("EPA Guidelines"), published by the U.S. Environmental Protection Agency, as may be amended or revised from time to time, and any other applicable, legally binding federal, state, or local laws, regulatory standards or guidelines, including local permitting and zoning. At the conclusion of the mold remediation, Tenant shall provide Landlord with a draft of the mold remediation report and give Landlord a reasonable opportunity to review and comment thereon, and when such report is finalized, promptly provide Landlord with a copy of the final remediation report.

(G)    Notwithstanding the foregoing, if the mold or Mold Conditions are solely the result of Landlord's failure to comply with its maintenance obligations under Article 10 (A), then the remediation required by this section shall be undertaken by Landlord at its cost and expense.

(H)    Tenant acknowledges and agrees that Landlord shall have a reasonable opportunity to inspect the remediated portion of the Leased Premises after the conclusion of the mold remediation. If the results of Landlord's inspection indicate that the remediation does not comply with the final remediation report or any other applicable federal, state, or local laws, regulatory standards or guidelines, including, without limitation, the EPA Guidelines, then Tenant, at its sole cost and expense, shall immediately take all further actions necessary to ensure such compliance.

(I)    The foregoing covenants and indemnity shall survive the expiration or any termination of this Lease.

22.    No Waivers by Landlord.  No waiver by Landlord of any breach by Tenant or requirement of obtaining Landlord's consent shall be deemed a waiver of any other provision of this Lease or any subsequent breach of the same provision or a waiver of any necessity for further consent. No payment by Tenant or acceptance by Landlord of a lesser amount than due from Tenant shall be deemed to be anything but payment on account, and Tenant's payment of a lesser amount with a statement that the lesser amount is payment in full shall not be deemed an accord and satisfaction. Landlord may accept this payment without prejudice to recover the balance due or pursue any other remedy. Landlord may accept payments even after default by Tenant without prejudice to subsequent or concurrent rights or remedies available to Landlord under this Lease, at law or in equity. Any acceptance by Landlord of any payment by Tenant after termination or expiration of the Lease Term shall not constitute an acceptance of Rent but rather a payment to Landlord on account of Tenant's use and occupancy of the Leased Premises. All rights and remedies which Landlord may have under this Lease, at law or

in equity shall be distinct, separate and cumulative and shall not be deemed inconsistent with each other, and any or all of such rights and remedies may be exercised at the same time.

23.     Landlord and Tenant Defined.  "Tenant" includes the persons named expressly as Tenant and its permitted transferees, successors and assigns. Except as otherwise provided in the next sentence, the agreements and conditions contained in this Lease shall be binding on and inure to the benefit of the parties hereto and their transferees, legal representatives, successors and assigns. "Landlord" means only the then-owner of the lessor's interest in this Lease, and in the event of a transfer by Landlord of its interest in this Lease, the transferor shall be automatically released from all liability and obligations as Landlord subsequent to the transfer. Notwithstanding anything to the contrary, Tenant agrees it will look solely to Landlord's estate in the Shopping Center as the sole asset for collection of any claim, judgment or damages or enforcement of any other judicial process requiring payment of money. Tenant agrees that no other assets of Landlord shall be subject to levy, execution or other procedures to satisfy Tenant's rights or remedies.

24.     Sole Broker.  Tenant represents that no broker, finder, or other person entitled to compensation, other than the Broker identified in Article 1(s) ("Broker"), was involved in this Lease, and that no conversations or prior negotiations were had with any broker, finder or other possible claimant other than Broker.  Landlord shall satisfy any obligation to Broker in respect to this Lease.  Landlord and Tenant shall defend, indemnify and hold each other harmless against any claims for compensation claimed by any broker or agent utilized by the indemnitor with respect to this Lease or the negotiation thereof.

25.     Estoppel Certificates.  From time to time, within ten (10) days following written notice, Tenant shall deliver to Landlord a signed and acknowledged written statement in recordable form certifying: the date of this Lease and that this Lease is in full force and effect and unmodified  except as stated; the monthly Base Rent payable during the Lease Term and the Percentage Rent Rate (if applicable); the date to which the Rent and other payments have been paid; whether Landlord is in default, or if there are any offsets, defenses, or counterclaims claimed or which could possibly be claimed by Tenant, and if a default, offset, defense, or counterclaim is claimed or could be claimed, specifying the specific nature and default; and stating any additional factual matters as may be reasonably requested by Landlord, a prospective purchaser or a mortgagee.  Any such certificate may be relied upon by Landlord, any mortgagee, proposed mortgagee, assignee, purchaser and any other party to whom such certificate is addressed. The failure of Tenant to respond, as set forth herein, shall be an acknowledgment by Tenant that the terms of such estoppel certificate are correct and, in addition, such failure shall be a material default by Tenant.

26.     Notices.  All notices intended to impose liability on the other party or exercise a right ("Notice") shall be in writing and sent by certified or registered mail, return receipt requested, or hand delivered by an authorized agent of either party, or delivered by a nationally recognized overnight courier (such as Federal Express or DHL) and, in order to be effective, a copy of any notice of Landlord's default must be sent by Tenant to the holders of any mortgages, ground leases or security interests as per Article 17(C) (if any). Notices shall be sent to the address set forth in Article 1 or to such other address as may be designated by notice and shall be effective the date received or refused, but in no event later than three (3) days after the notice was mailed, or if by hand delivery or courier delivery, the day delivered. If courier delivery is refused or not able to be made, the day delivery was first attempted shall be deemed the delivery date.

27.     Security Deposit.  Upon Tenant's execution of this Lease, Tenant shall pay the Security Deposit as security for the payment of Rent and Tenant's performance and observance of this Lease. Said Security Deposit may be commingled with other funds of Landlord, and Landlord shall have no liability for the accrual or payment of any interest thereon.  If Tenant defaults under this Lease, or defaults under any other lease or agreement between Tenant and Landlord or an affiliate of Landlord, Landlord may, without prejudice to any other available remedy, apply the Security Deposit towards curing the default and compensating Landlord for loss or damage arising from the default. At the expiration of this Lease, if Tenant is not in default or otherwise liable to Landlord, the unapplied balance of the Security Deposit shall be returned to Tenant. If at any time Landlord applies part or all of the Security Deposit to cure a Tenant default, Tenant shall pay to Landlord the amount so applied within five (5) days following written demand by Landlord, thereby restoring the amount of the Security Deposit, so Landlord shall have on hand the full original amount of the Security Deposit at all times. If Landlord transfers this Lease and Security Deposit to a transferee, the transferor shall be released from liability with respect to the Security Deposit or its return to Tenant; Tenant shall look only to such transferee with respect thereto. On any transfer by Tenant of its interest in this Lease, the Security Deposit shall be deemed transferred to the assignee. The Security Deposit shall not be mortgaged, assigned, transferred or encumbered by Tenant without the consent of Landlord, and any such act on the part of Tenant shall be without force and effect and shall not be binding upon Landlord.

28.     Miscellaneous Provisions.
        (A)     Entire Agreement.  This Lease contains the entire agreement between the parties. No oral statements or representations or written matter not contained in this Lease shall have any force or effect.  This Lease cannot be modified or terminated orally, but only by a writing signed by Landlord and Tenant, except for a termination expressly permitted by this Lease. If more than one party executes this Lease as "Tenant", the liability of all such signatories shall be joint and several. If any provision or the application thereof to any person or circumstance shall to any extent be declared by a court to be invalid, the remainder of this Lease shall not be affected.

        (B)     Recording.  Neither this Lease nor any memorandum, assignment or memorandum of assignment thereof shall be recorded in any public records without Landlord's prior written consent and joinder.

        (C)     Authority.  If Tenant is not an individual, the person signing this document on behalf of Tenant represents (by such signature) that (i) Tenant is qualified to do business in the state where the Shopping Center is located, and (ii) he or she has been duly authorized by Tenant to execute this document and that such signature creates a binding obligation of Tenant. This Lease shall become effective as a lease or agreement only upon mutual execution and delivery and if not fully executed and delivered cannot give rise to any rights or remedies. Landlord represents that Landlord has the right and authority to enter into this Lease.

Initials: L _____

(D)    Interest.    The term "interest rate" as used in this Lease shall mean Eighteen Percent (18%) per annum or the maximum interest rate permitted by law, whichever is lower.

(E)    Construction of Language.    All provisions of this Lease shall be construed without reference to any rule or canon requiring or permitting the construction of provisions of documents for or against the interest of the party responsible for the drafting of the same. It being the intention and agreement of the parties that this Lease be conclusively deemed to be the joint product of both parties and their counsel. The captions, section numbers, and article numbers appearing in this Lease are inserted only as a matter of convenience and in no way define, limit, construe, or describe the scope or intent of such sections or articles of this Lease nor in any way affect this Lease. The word "Tenant" shall be deemed and taken to mean each and every person or party mentioned as a Tenant herein, and the permitted subtenants, assigns and successors thereof. The use of the neuter singular pronoun to refer to Landlord or Tenant shall be deemed a proper reference even though Landlord or Tenant may be an individual, a partnership, a corporation, or a group of two or more individuals or corporations. Nothing contained herein shall be deemed or construed by the parties hereto, or by any third party, as creating the relationship of principal and agent, or of partnership or of joint venture between the parties hereto, it being understood and agreed that neither the method of computation of Rent nor any other provision contained herein, nor any acts of the parties herein, shall be deemed to create any relationship between the parties hereto other than that of Landlord and Tenant.

(F)    Force Majeure.    Where either party hereto is required to do any act but is untimely in completing the act, the time attributable directly to delays caused by an Act of God, hurricane, tornado, adverse weather condition, energy shortage, war, civil commotion, acts of terrorism, fire or other casualty, or causes beyond such party's reasonable control (excluding financial) shall not be counted in determining the time during which such act is to be completed. In any case where work is to be paid for out of insurance proceeds or condemnation awards, due allowance shall be made for delays in the collection of such proceeds and awards. This subparagraph (F) shall not be applicable at all to excuse or permit delay of the time for Tenant to pay Rent or obtain and maintain insurance.

(G)    Governmental Regulations.    Tenant shall not do, and shall not permit persons within Tenant's control to do, any act or thing in or upon the Leased Premises which will invalidate or be in conflict with the certificate of occupancy for the Leased Premises or violate any other zoning ordinances, and rules and regulations of governmental or quasi-governmental authorities having jurisdiction over the Leased Premises. Tenant shall, at Tenant's sole cost and expense, comply with all existing and future laws, ordinances, orders and regulations of federal, state, county and municipal authorities, including, but not limited to, applicable terms of the county building code for the county in which the Leased Premises is located and the Americans With Disabilities Act as some are amended from time to time with respect to the Leased Premises or the use or occupancy thereof. Landlord makes no representation as to the suitability of the Leased Premises for the Permitted Use.

(H)    Governing Law.    This Lease shall be governed by, and construed and enforced in accordance with, the laws of the State in which the Shopping Center is located.

(I)    Accord and Satisfaction.    Payment by Tenant or receipt by Landlord of a lesser amount that the Rents herein stipulated may be, at Landlord's sole option, deemed to be on account of the earliest due stipulated Rents, or deemed to be on account of Rent owing for the current period only, notwithstanding any instructions by or on behalf of Tenant to the contrary, while instructions shall be null and void, and no endorsement or statement of any check or any letter accompanying any check payment as rents shall be deemed an accord and satisfaction, and Landlord shall accept such check or payment without prejudice to Landlord's right to recover the balance of such rents or pursue any other remedy in this Lease or in law or in equity against Tenant.

(J)    Execution of Lease; No Option.    The submission of this Lease to Tenant shall be for examination purposes only, and does not and shall not constitute a reservation of or offer or option for Tenant to lease, or otherwise create any interest if Tenant in the Leased Premises or any other premises situated in the Shopping Center. Execution of this Lease by Tenant shall be irrevocable. The return to Landlord of Tenant-executed copies of this Lease shall not be binding on Landlord, notwithstanding any preparation or anticipatory reliance or expenditures by Tenant or any time interval, until Landlord has in fact executed and actually delivered a fully executed copy of this Lease to Tenant.

(K)    Trial by Jury Waiver.    Landlord and Tenant mutually agree that they hereby waive trial by jury in any action, proceeding or counterclaim brought by either party against the other as to any matter arising out of or connected with this Lease, or their relationship as Landlord and Tenant, or Tenant's use or occupancy.

(L)    Attorney Fees.    In case of any action or proceeding brought to enforce the terms and provisions of this Lease, the unsuccessful party in any such action or proceeding shall pay for all costs, expenses and reasonable attorneys' fees (at all tribunal levels) incurred by the prevailing party or its agents or both in enforcing the covenants and agreements of this Lease upon the entry of a final nonappealable judgment. If any item of Rent is collected by, through or with the advice of any attorney-at-law, Tenant shall pay Landlord's reasonable attorneys' fees and costs of collection. The provisions of this sub-paragraph shall survive the expiration or earlier termination of this Lease.

(M)    Financial Statements.    At the request of Landlord, Tenant shall, not later than ninety days following the close of each fiscal year of Tenant during the Term, furnish to Landlord an audited balance sheet of Tenant as of the end of such fiscal year and a statement of income and expense for the fiscal year then ended together with an opinion of an independent certified public accountant of recognized standing to the effect that the said financial statements have been prepared in conformity with generally accepted accounting principles consistently applied and fairly present the financial condition and results of operations of Tenant as of and for the period(s) covered.

(N)    Survival.    Any provision of this Lease which obligates the Landlord or the Tenant to pay an amount or perform an obligation after the expiration of the Term shall be binding and enforceable notwithstanding that payment or performance is not within the Term, and the same shall survive the expiration of the Term.

(O)  **Time**.  Time is of the essence of this Lease, and all provisions herein relating thereto shall be strictly construed.

(P)  **No Interference**.  Tenant hereby represents and warrants to Landlord that in negotiating and entering into this Lease with Tenant, Landlord has not interfered with any contract or other business relationship or arrangement between Tenant and any former landlord, prospective landlord or other party.  Tenant acknowledges that the foregoing representations and warranties are material to Landlord, that Landlord has relied upon same in entering into this Lease with Tenant, and that but for such representations and warranties, Landlord would not have entered into this Lease with Tenant.

(Q)  **USA Patriot Act**.

a.  Certification.  Pursuant to *Executive Order 13224*, signed by President George W. Bush on September 24, 2001, each party hereby certifies that:

(i)  It is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control; and

(ii)  It is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction directly or indirectly on behalf of, any such person, group, entity, or nation.

b.  Indemnification.  Each party hereby agrees to defend, indemnify and hold harmless the other party from and against any and all claims, damages, losses, risks, liabilities and expenses (including reasonable attorneys' fees and costs) arising from or related to any breach of the foregoing certification.

(R)  **Radon Gas**.  In accordance with the requirements of Florida Statutes Section 404.056(5), the following notice is hereby given to Tenant:

**Radon Gas:**  Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time.  Levels of radon that exceed federal and state guidelines have been found in buildings in Florida.  Additional information regarding radon and radon testing may be obtained from your county health department.

*Remainder of page intentionally left blank; signature page follows.*

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease, or have caused the same to be executed as of the day and year first above written.

Signed, Sealed and Delivered in the presence of:

Witness # 1 as to Landlord:

Print Name: _____

Witness # 2 as to Landlord:

Print Name: _____

Witness # 1 as to Tenant:

Print Name: _LINDA MAE BOYLE_

Witness # 2 as to Tenant:

Print Name: _MIGUEL SALAZAR R._

LANDLORD:

GRI-EQY (Sunset 97) LLC, a Delaware limited liability company
By: GRI-EQY I, LLC, Managing Member
  By: EQY Portfolio Investor (GRI) Inc.,
Manager

By: _____
Name: _Arthur L. Gallagher_
Title: _Vice President_

TENANT:

CSC Enterprise, Inc., a Florida corporation

By: _____
Name: _Chris E. Hirsh_
Title: _Pres._

Initials: L____ T____

EXHIBIT A

SITE PLAN

NOTE: THE ATTACHED SITE PLAN IS INTENDED SOLELY AS AN APPROXIMATE DEPICTION OF THE GENERAL LAYOUT OF (a) THE SHOPPING CENTER AND CERTAIN OF THE BUILDINGS AND OTHER IMPROVEMENTS THAT COMPRISE THE SHOPPING CENTER AND (b) THE APPROXIMATE SIZE, CONFIGURATION AND LOCATION OF THE LEASED PREMISES WITHIN THE SHOPPING CENTER.   TENANT ACKNOWLEDGES THAT THE PRECISE SIZE AND CONFIGURATION OF THE SHOPPING CENTER AND/OR THE PRECISE SIZE, CONFIGURATION AND/OR LOCATION OF THE LEASED PREMISES AND/OR THE BUILDINGS AND OTHER IMPROVEMENTS COMPRISING THE SHOPPING CENTER, INCLUDING ACCESS POINTS, DRIVEWAYS AND THE LIKE, MAY VARY FROM THAT DEPICTED ON THE ATTACHED SITE PLAN AND TENANT WAIVES ALL OBJECTIONS AND CLAIMS WITH RESPECT THERETO AND ACCEPTS THE LEASED PREMISES, SHOPPING CENTER AND THE BUILDINGS AND OTHER IMPROVEMENTS THAT COMPRISE THE SHOPPING CENTER, INCLUDING ACCESS POINTS, DRIVEWAYS AND THE LIKE, IN THEIR ACTUAL EXISTING CONDITION, AS SAME MAY BE ALTERED, MODIFIED, ETC. FROM TIME TO TIME IN  ACCORDANCE WITH THE TERMS OF THE WITHIN LEASE.  MOREOVER, NO REPRESENTATIONS ARE MADE BY THE LANDLORD AS TO THE EXISTENCE OR CONTINUITY OF ANY OF THE TENANTS SHOWN THEREON.



SPACE #61

SW 72nd Street (Sunset Drive)

Initials: L        T

EXHIBIT B

LANDLORD'S WORK

Landlord has agreed to expend the sums required to perform the work described herein in material reliance upon the undertaking and agreement of Tenant to fully and faithfully perform, in a timely manner, all duties and obligations on Tenant's part to be performed under this Lease. In the event of default by Tenant under this Lease, Tenant shall be obligated, forthwith upon demand by Landlord, to reimburse Landlord for all such sums so expended, together with interest thereon at the Default Interest Rate set forth in the Lease.

The Tenant acknowledges that the Leased Premises are being delivered to Tenant "AS-IS" "WHERE-IS," excepting only the following work which is anticipated to be completed by Landlord prior to date upon which Tenant shall open for business:

None Stated

Initials: L_____JT_____

EXHIBIT C

SHOPPING CENTER SIGN CRITERIA

**All Signs and window lettering require a detailed rendering submitted for LANDLORD'S approval before installation.**

1) TENANT(S) shall provide, have installed, illuminate, maintain and remove, and patch back holes at TENANT(S) expense, a lighted store identification sign on store front facade, window lettering and one under canopy U.L. rated sign.

2) Facade signs shall be individual letters, neon illuminated, attached to a raceway and mounted to facade; raceway and returns are painted to building standard. The color and type style of each letter face is subject to approval by LANDLORD.

3) Recommended type styles are BOLD styles of Helvetica, Futura, and Corinthian.   Any other and/or nontraditional styles and/or all Logos are subject to approval by LANDLORD.

4) Width of Sign shall be limited to 75% of store front width.

5) Height of Sign shall be limited to o maximum 24" and a minimum of 16".

    a) If letters are all one size, maximum shall be 24" and a minimum of 16".
    b) If letters are upper and lower case, upper case maximum 24" lower case maximum 18".
    c) Sign copy shall be in one single row.
    d) Letters shall have bronze cans and trim cap shall be bronze.

6) No exposed neon, flashing signs, protruding signs or banners of any kind are acceptable.

7) All signs are to be constructed of a minimum .040 gauge aluminum sheet, with 3/16" flexible face and a maximum of 4" depth.

8) Raceway shall be constructed from extruded materials and shall contain all wiring connections, appropriate transformers, mounting brackets, wiring conduit and timer, all of which are to be hidden from view. Raceway shall not exceed 6" in height and 6" in depth.

9) Under canopy sign shall be in conformity to center standards and approved by LANDLORD.

10) Signs shall be lighted from dusk to dawn, seven days a week.

11) All Sign work is to be performed by licensed and insured sign company.

12) Tenant shall be responsible for poor workmanship, construction, and mounting. Tenant shall bear the cost of remounting and correcting said poor workmanship. The intent is to have sign constructed and installed in a professional manner which compliments and blends with existing signs.

13) TENANT is responsible for permitting and meeting all zoning codes requirements and shall hold LANDLORD harmless from any violations resulting therefrom.

LANDLORD HAS EXACT RACEWAY PAINT CODES, NEAREST MATCH IS NOT ACCEPTABLE.   LANDLORD MUST BE PROVIDED A DETAILED COLOR RENDERING, INCLUDING CROSS SECTION, OF SIGN FOR APPROVAL PRIOR TO INSTALLATION.

Initials: L _____ T

EXHIBIT C-1



Initials: _____

EXHIBIT D

## RULES AND REGULATIONS

1.  Tenant's contractors and installation technicians shall comply with Landlord's rules and regulations pertaining to construction and installation. This provision shall apply to all work performed on or about the Leased Premises or Shopping Center, including installation of telephones, telegraph equipment, electrical devices and attachments and installations of any nature affecting floors, walls, woodwork, trim, windows, ceilings and equipment or any other physical portion of the Leased Premises or Shopping Center.

2.  Tenant shall not at any time occupy any part of the Leased Premises or Shopping Center as sleeping or lodging quarters.

3.  No dogs, cats, fowl, or other animals shall be brought into or kept in or about the Leased Premises or Shopping Center, except for seeing-eye dogs.

4.  None of the parking, entries, passages, doors, hallways or stairways shall be blocked or obstructed by any rubbish, litter, trash, or material of any nature placed, emptied or thrown into these areas, nor shall such areas be used by Tenant's agents, employees or invitees at any time for purposes inconsistent with their designation by Landlord.

5.  The water closets and other water fixtures shall not be used for any purpose other than those for which they were constructed.

6.  Tenant shall not canvas, solicit or peddle (including the placement of flyers) in the Common Areas of the Shopping Center.

7.  Landlord reserves the right to exclude from any restricted access portions of the Shopping Center and any common areas exclusively serving the same, all persons who are not known to the security personnel for the Shopping Center and who do not present a pass to the restricted areas signed by the Tenant.

8.  If any governmental license or permit shall be required for the proper and lawful conduct of Tenant's business, Tenant, before occupying the Leased Premises, shall procure and maintain such license or permit and Tenant shall at all times comply with the terms of any such license or permit.

9.  Tenant shall continuously operate the HVAC units in the Leased Premises.

Landlord reserves the right to make such other and further reasonable rules and regulations as in its judgment may from time to time be necessary, for the safety, care and cleanliness of the Shopping Center.

Initials: L_____T

EXHIBIT E

TENANT'S WORK

I.    Tenant's Plans and Specifications.

(1)    In the event Tenant plans to improve or renovate or alter the Leased Premises, Tenant shall, within thirty (30) days following the execution of this Lease, prepare at Tenant's sole cost and expense and present to Landlord plans and specifications for work to be done to the Leased Premises in accordance with Tenant's requirements. Tenant shall provide Landlord with four (4) sets of such plans and specifications duly sealed and signed by a registered architect, containing the following information (unless otherwise specifically agreed by Landlord):

| | | |
|---|---|---|
| (a) | Floor plan | 1/8" scale |
| (b) | Overall Sections | 1/8" scale |
| (c) | Storefront and Interior Elevations | 1/8" scale |
| (d) | Sections of Partition Types | 1/2" scale |
| (e) | Details of Special Conditions | 1-1/2" scale |
| (f) | Door Schedule w/Door & Head Details | 1-1/2" scale |
| (g) | Finish Schedule | |
| (h) | Sign Drawings and Details | 1-1/2" scale |
| (i) | Electrical, Plumbing and Mechanical Plans indicating items not presently existing Outline specifications covering all tenant work, including additional plans drawn to suitable scale indicating additional items of construction not specifically mentioned above. | |
| (j) | Sprinkler plans (if applicable). | |
| (k) | Electrical load calculations and riser diagrams, if other than existing. | |
| (l) | HVAC load calculations and air conditioning unit specifications, if other than existing. | |
| (m) | Number, location and size of all roof openings and penetrations, with complete data on the operating weight and load support plan for all equipment located within the Leased Premises. | |

(2)    Within five (5) days after Landlord's receipt of Tenant's plans and specifications, Landlord shall either: (a) evidence its approval by endorsement to that effect by signature of initials on one (1) set of said plans and specifications and return of such signed or initialed set to Tenant (whereupon such approved preliminary plans and specifications shall then constitute the final plans and specifications); or (b) refuse such approval if Landlord shall determine that the same; (i) do not conform to the standard of design, motif and decor established or adopted by Landlord or other tenants in the Leased Premises; or (ii) would subject Landlord to any additional cost, expense or liability or would subject the Leased Premises to any violation of law, fine, or penalty; or (iii) would in any way adversely affect the reputation, character or nature of the Leased Premises; or (iv) would provide for or require any installation or work which is or might be unlawful or create an unsound or dangerous condition or adversely affect the structural soundness of the Leased Premises or the building of which the Leased Premises are a part; or (v) would interfere with or abridge the use and enjoyment of any adjoining space in the building in which the Leased Premises are located. If the Landlord does not approve said plans and specifications Landlord shall advise Tenant of those revisions or corrections which Landlord requires and Tenant shall, within seven (7) days thereafter, submit proposed plans and specifications, so revised or corrected as to satisfy Landlord's requirements, to Landlord for its approval in accordance with this Section. Tenant shall furnish to Landlord any further information concerning plans and specifications within five (5) days after Landlord's request therefor. Tenant shall make no changes in the final plans and specifications without Landlord's prior written consent and shall pay any additional architectural or construction costs incurred in making changes, substitutions or elimination's in such approved plans and specifications as may be required by Tenant and approved by Landlord.

(3)    Tenant shall, at its sole cost and expense, obtain all necessary building permits and approvals from the applicable municipal building inspector(s), fire marshal, and any other governmental authority having jurisdiction, based upon the final plans and specifications as provided above.  Tenant shall also obtain any necessary permits and approvals from all utility companies for any additional connections required by Tenant and pay any fees resulting therefrom. Upon issuance of such permits and approvals and payment of fees therefor, Tenant shall supply Landlord with a complete set of Tenant's plans and specifications, properly stamped and approved by the aforementioned governmental authorities and utility companies

II.    Tenant's Construction.

(1)    All construction work necessary to finish the Leased Premises shall begin within five (5) days following Tenant's receipt of the necessary building permits and approvals, and shall be carried out strictly in accordance with final plans and specifications approved as provided in Section I of this Exhibit and shall be performed by such contractor or contractors as Landlord shall approve. Notwithstanding the foregoing, all roof openings, penetrations and roof restoration, as well as in the installation of all structural supports, shall be performed at Tenant's expense by the roofing contractor or subcontractor who performed the roofing work upon the initial construction of the Leased Premises or by such roofing contractor as Landlord may designate. Upon completion of the work performed pursuant to this Exhibit said roofing contractor shall furnish a letter addressed to Landlord stating that the work done in accordance with Tenant's plans and specifications and the construction contract hereinafter referred to has not affected the bond ability of the Leased Premises' roof.

(2)    All construction by Tenant shall comply in every respect with applicable building, fire and underwriter's codes and shall be completed in a first class, workmanlike manner, using new materials, fixtures and equipment.

(3)    All construction and completion work necessary to alter and finish the Leased Premises in accordance with Tenant's approved plans and specifications, including the work specified in the preceding

Initials: L_____ T_____

paragraph, as well as all disbursements of money, shall be in accordance with the following procedures and conditions:

(a)    Tenant's contractor and Tenant shall prepare or cause to be prepared a contract wherein the contractor shall agree to complete and finish the Tenant's improvements in accordance with plans and specifications approved as provided in this Lease.

(b)    Said contract shall be in the form of the current edition of Document A101 or Document A107 of the American Institute of Architects, shall be subject to Landlord's prior written approval and shall provide, among other things, as follows:

(i)    That notwithstanding anything contained in the contract documents to the contrary, the contractor will perform the work and furnish the materials required therefor on the sole credit of Tenant; that no lien for labor or materials will be filed or claimed by the contractor against Landlord's fee interest in the Leased Premises or the Shopping Center or any part thereof, but only against Tenant's leasehold interest therein;

(ii)    That said contractor shall furnish a bond in an amount equal to twice the contract sum issued by a bonding company approved by Tenant and Landlord and licensed to do business in the state where the Leased Premises are located, assuring the performance of the contract and the payment of all obligations arising thereunder, in such form as Tenant may approve and wherein the Landlord is named as co-obligee;

(iii)    That said contractor shall furnish Tenant and Landlord with certificates of insurance evidencing insurance against claims under worker's compensation acts and other employee benefits acts, in compliance with statutory limits, but in no event less than $600,000.00; claims for damages because of bodily injury, including death, to said contractor's employees and-all others, with limits of $1,000,000.00 per person and $1,000,000.00 per occurrence; and damages to property with limits of $100,000.00, if any or all of the foregoing arise out of or result from the contractor's operations under the contract whether such operations (including operation of automobile vehicles) be by the contractor or any subcontractor or anyone directly or indirectly employed by either; and All Risk Builders Risk Casualty and Liability Insurance in the full amount of the contract sum. All of said policies of insurance shall name as insured parties thereunder Landlord and its agents and other parties designated by Landlord and shall carry an endorsement insuring against the following contractual liability, which shall be imposed upon the contractor by the construction contract:

The contractor shall be responsible from the time of his signing the contract or from the time of the beginning of the first work, whichever shall be earlier, for all injury or damage of any kind to persons or property resulting from the work in addition to the liability imposed upon the contractor on account of personal injury (including death) or property damage suffered through the contractor's negligence, which liability is not impaired or otherwise affected hereby. The contractor assumes the obligation to save the Landlord harmless and to indemnify the Landlord from every expense, liability, or payment arising out of or through injury (including death) to any person or persons or damage to property or any person at any place in which work is located arising out of or suffered through any act or omission of the contractor or any subcontractor, or anyone either directly or indirectly employed by or under the supervision of any of them in the prosecution of the work included in this contract;

(iv)    That the contractor at all times shall keep the Leased Premises and adjacent areas free from accumulation of waste materials or rubbish caused by its operation and shall be responsible for initiating, maintaining and supervising safety precautions and programs in connection with the work and shall take all reasonable precautions for the safety of, and shall provide all reasonable protection to prevent damage, injury or loss to (aa) all employees on the work site and other persons who may be affected thereby; (bb) all the work and all materials and equipment to be incorporated therein; and (cc) other property of the work site adjacent thereto, such precautions to include without limitation the furnishing of guard rails and barricades and the securing of the Leased Premises; and

(v)    That Landlord shall be deemed a third party beneficiary of the undertakings and agreement of the Contractor as set forth in said contract.

(4)    Tenant shall at no time have permission to authorize or permit to be made any roof, flooring slab or exterior wall penetrations. Any such penetrations shall only be made with Landlord's prior written authorization and consent. Landlord reserves the right to withhold consent or authorization with respect to any of such matters, in Landlord's sole discretion. Tenant shall be in breach of this Lease if it shall violate the provisions set forth in this clause.

(5)    No construction shall be commenced by Tenant prior to Tenant's full compliance with the requirements of this Exhibit and Landlord's written authorization and consent to commencement of work in the Leased Premises. Tenant shall cooperate fully with Landlord, and shall cause its contractor to cooperate fully with Landlord, in the scheduling of delivery of materials to the Leased Premises and construction of Tenant's improvements so as to minimize interference with and disturbance of the operations of other tenants and occupants of the Leased Premises and their customers and invitees.

(6)    If alterations performed by, or herein contemplated by Tenant, shall cause to be imposed, directly or indirectly, additional code requirements from regulating authorities, Tenant shall be responsible for all costs in connection with said alterations or contemplated alterations and/or with compliance with such code requirements.

(7)    For any alterations which are made by or on behalf of Tenant during the Term of this Lease, Tenant shall provide Landlord with correct copy of any "Certificate(s) of Occupancy" or "Certificates of Completion." Failure to provide same to Landlord within five (5) days following Tenant's receipt thereof shall constitute a default under this Lease.

Initials: L_____ ___

EXHIBIT F

RESTRICTED AND PROHIBITED USES

Tenant shall not at any time: (i) operate its business under this Lease so as to violate any restrictive covenant, restrictive agreement or exclusive use agreement then contained in any other lease; (ii) sell or consume, or suffer or permit the sale of consumption of, alcoholic beverages on the Leased Premises, unless the same is included in the Permitted Use and appropriate licenses and insurance coverage has been secured and documentation thereof has been received by Landlord; (iii) use the Common Areas or any other area outside of the Leased Premises for the sale or display of any merchandise, for solicitations or demonstrations, for advertising (including handbills, flyers or leaflets in or on automobiles parked in the Shopping Center's parking lots or other Common Areas), or for any other business, occupation, undertaking or activity and Tenant shall not place or permit any obstruction in such areas or in any hallway, passageway, corridor or vestibule; (iv) erect or maintain any barricade or scaffolding which may obscure the signs, entrances or show windows of any other tenant in the Shopping Center, or which may tend to interfere with any such other tenant's business; (v) use, or permit or suffer the use of, any portion of the Leased Premises for any unlawful purpose or for any activity which violates any certificate of occupancy affecting the Leased Premises or the Shopping Center or which is of a type which is not reasonably appropriate for the Shopping Center; (vi) burn trash or, except for the use of so-called "Dempster Dumpsters" or other types of receptacles designated from time to time by Landlord (or any applicable public authority or trash removal agency or company) located in a screened or enclosed area, store any trash or garbage in any area other than inside the Leased Premises (and Tenant shall attend to the daily disposal of trash in the manner and by the agency or company designated by the Landlord, all at Tenant's sole cost and expense which may, at Landlord's sole and exclusive option, either (aa) be billed directly to Tenant by Landlord (or by the trash removal agency or company designated), in which case, Tenant shall pay the cost thereof within ten (10) business days following the delivery of the bill or invoice to Tenant, or (bb) be charged to Tenant as part of the Operating Expenses (with Tenant's Proportionate Share of such trash removal costs to be determined on the basis of an allocation thereof among all tenants contributing thereto, such allocation to be made by Landlord from time to time in such manner as Landlord, in is sole and absolute discretion, shall deem proper). In this connection, Tenant shall clean and maintain all common loading areas and areas adjacent to trash receptacles in a manner satisfactory to the Landlord. Tenant shall flatten or otherwise break down all boxes and/or other packaging before depositing same into the trash receptacles. Should Tenant fail to clean or maintain such areas in a manner satisfactory to Landlord, Landlord may clean and/or maintain such areas (or cause same to be cleaned and/or maintained), and Tenant shall be obligated to reimburse Landlord forthwith upon presentation to Tenant of a bill or invoice therefor, for all costs and expenses incurred in connection therewith, together with a surcharge of twenty percent (20%) of the costs and expenses incurred, to reimburse Landlord for its overhead and/or supervision costs relative thereto; (vii) park, or permit or suffer to be parked, trucks or other delivery vehicles in areas in which Landlord has prohibited such parking; (viii) suffer, permit or commit any waste or any public or private nuisance or other act or thing in the Leased Premises which may disturb or constitute a menace to any other tenant or occupant in the Shopping Center; (ix) install any phonograph, radio, television, loud speakers or other similar device on the Leased Premises without first obtaining in each instance Landlord's consent in writing, or permit music or any other sounds in the Leased Premises to be heard outside of the Leased Premises, or produce or create obnoxious fumes or odors, or otherwise cause unreasonable interference with any other tenant of the Shopping Center, (x) use, or permit or suffer the use of, any machines or equipment in the Leased Premises which cause vibration or noise that may damage the Leased Premises or any part thereof or the building of which the Leased Premises form a part or that may be transmitted to or heard in any other building or leased premises in the Shopping Center or in any part of the Common Areas; (xi) conduct any public or private auction, fire, bankruptcy, distress, liquidation, "going-out-of-business" or selling-out sale in or about the Leased Premises, or otherwise conduct its business in a manner that might give the public the impression that Tenant is about to cease operation in the Leased Premises (and Landlord shall be the sole judge as to what shall constitute a "distress-type" sale); or (xii) operate its business in the manner commonly referred to or known as a "discount house," "cut-rate store," "outlet store" or the like.

Initials: _____

EXHIBIT G

FORM  -  <u>COMMENCEMENT DATE STATEMENT</u>

THIS STATEMENT, is made this _____ day of _____, 200___, by and between _____
_____ (herein "Landlord"), and _____(herein "Tenant").
<u>W I T N E S S E T H</u>:

WHEREAS, Landlord and Tenant have entered into that certain Lease dated _____, 200___ (the
"Lease"), for certain property located at _____ in City of _____, State of _____.
NOW THEREFORE, Landlord and Tenant desire to confirm that the following terms, of which are defined in
the Lease shall have the meanings set forth below for all purposes in the Lease:
1.    The Commencement Date of the Lease is _____, 200___.
2.    The Rent Commencement Date of the Lease is _____, 200___.
3.    The initial _____ (____) year term of the Lease shall expire on _____, 20___.
4.    (IF APPLICABLE ADD:) Tenant has _____ (__) separate options to extend the Term for ____
_____(__) years each.

IN WITNESS WHEREOF, the parties hereto have executed this Statement as of the day and year written
next to their respective signatures.

Signed, Sealed and Delivered in the presence of:        LANDLORD:

Witness # 1 as to Landlord:

Print Name: _____                 a _____

Witness # 2 as to Landlord:

Print Name: _____                 By: _____
                                                        Name: _____
                                                        Title: _____


TENANT:

Witness # 1 as to Tenant:

Print Name: _____                 a _____

Witness # 2 as to Tenant:

Print Name: _____                 By: _____
                                                        Name: _____
                                                        Title: _____

Initials: L _____

EXHIBIT H

GUARANTY OF LEASE

THIS GUARANTY OF LEASE (this "Guaranty") is made for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, by Chris Hirsh (collectively, "Guarantor"), in favor of GRI_EQY (Sunset 97) LLC("Landlord"), in connection with that certain Shopping Center Lease Agreement dated the date hereof (the "Lease"), pursuant to which Landlord leases to CSC Enterprise, Inc., a Florida corporation ("Tenant"), that certain premises generally referred to as Suite/Store No. 1, (the "Premises") in the Shopping Center known as Shoppes Sunset, located in the City of Miami, State of Florida (the "Shopping Center"):

1.        Guarantor does hereby absolutely, unconditionally and irrevocably guarantee and promise to Landlord the due, punctual and full performance by Tenant of each and all of the agreements, covenants, obligations, liabilities and promises of Tenant to be performed during the Lease Term (as hereinafter defined) and the truth and accuracy of each and all of the representations and warranties of Tenant contained in the Lease, including without limitation, the payment of Base Rent, Percentage Rent (if any), Operating Expenses and all items of Additional Rent (as defined in the Lease) and any and all other sums payable thereunder. For the purposes of this Guaranty, the term "Lease Term" refers not only to the Term as defined in the Lease, but also to any renewals, extensions, modifications, reinstatements and holdings over thereof.

2.        Guarantor does hereby agree that, without the consent of or notice to Guarantor and without affecting any of the obligations of Guarantor hereunder: (a) any term, covenant or condition of the Lease may be amended, compromised, released or otherwise altered by Landlord and Tenant, and Guarantor does guarantee and promise to perform all the obligations of Tenant under the Lease as so amended, compromised, released or altered; (b) any guarantor of or party to the Lease may be released, substituted or added; (c) any right or remedy under the Lease, this Guaranty or any other instrument or agreement may be exercised, not exercised, impaired, modified, limited, destroyed, or suspended; (d) Landlord or any other Person (hereinafter defined in Paragraph 10 below) may deal in any manner with Tenant, any guarantor, any party to the Lease or any other Person; and (e) all or any part of the premises or of Tenant's rights or liabilities under the Lease may be sublet, assigned or assumed.

3.        Guarantor hereby waives and agrees not to assert or take advantage of: (a) any right to require Landlord to proceed against Tenant or any other Person or to pursue any other remedy before proceeding against Guarantor; (b) the defense of any statute of limitations in any action under or related to this Guaranty or the Lease; (c) any right or defense that may arise by reason of the incapacity, lack of authority, death or disability of Tenant or any other Person; (d) any right or defense arising by reason of the absence, impairment, modification, limitation, destruction or cessation (in bankruptcy, by an election or remedies, or otherwise) of the liability of Tenant, of the subrogation rights of Guarantor or of the right of Guarantor to proceed against Tenant for reimbursement; and (e) the benefits of any statutory provision or procedural rule limiting the liability of a surety.

4.        Guarantor hereby waives and agrees not to assert or take advantage of any right or defense based on the absence of any or all presentments, demands (including demands for performance), notices (including notices of adverse change in the financial status of Tenant or other facts which increase the risk to Guarantor, notices of non-performance and notices of acceptance of this Guaranty) and protests of each every kind.

5.        Guarantor does hereby agree that if claim is ever made upon Landlord for repayment or recovery of any amount or amounts received by Landlord in payment or on account of the amounts hereby guaranteed and Landlord repays all or part of such amount by reason of (a) any judgment, decree or order or of any court or administrative body having jurisdiction or (b) any settlement or compromise of any such claim effected by Landlord with any such claimant (including Tenant or any other guarantor), then in such event Guarantor agrees that any such judgment, decree, order, settlement or compromise shall be binding upon Guarantor, notwithstanding the expiration or termination of the Lease or other instrument evidencing any of the amounts hereby guaranteed and Guarantor shall be and remain liable hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by Landlord.

6.        Guarantor does hereby agree that for Landlord's benefit and the benefit of Tenant and to the fullest extent permitted by law, Guarantor irrevocably and unconditionally waives any and all rights of subrogation, reimbursement, indemnification, contribution, or similar rights against Tenant or its assets (arising by contract or by law or otherwise) as a consequence of this Guaranty, including, without limitation, the payment or performance of any obligations hereby guaranteed, and further agrees that Guarantor will not assert any such right of subrogation, reimbursement, indemnification, contribution or similar right of any time in respect to the Lease. It is agreed that Landlord's rights under this Paragraph 6 are such that the remedy at law for breach thereof would be inadequate, and that Landlord shall be entitled to specific performance and enforcement thereof, including, without limitation, the imposition of a restraining order or injunction. Nothing in this Paragraph 6 shall diminish or relieve any obligations or liabilities of Tenant to Landlord. Landlord and Tenant and their respective successors and assigns are intended third party beneficiaries of the waivers and agreements made in this Paragraph 6 and Landlord's rights under this Paragraph 6 shall survive the expiration or termination of the Lease.

7.        The liability of Guarantor and all rights, powers and remedies of Landlord hereunder and the liability and obligations of Tenant and all rights, powers and remedies of Landlord under the Lease and under this Guaranty shall be in addition to all rights, powers and remedies given to Landlord by law.

8.        This Guaranty applies to, inures to the benefit of and binds all parties hereto, their heirs, devisees, legatees, executors, administrators, representatives, successors and assigns (including any purchaser at judicial foreclosure or trustee's sale or a holder of a deed in lieu thereof). This Guaranty may be assigned by Landlord voluntarily or by operation of law without reducing or modifying the liability of Guarantor hereunder.

Initials: L_____

9.      This Guaranty shall constitute the entire agreement between Guarantor and Landlord with respect to the Guarantor's guaranty of performance of all of Tenant's obligations under the Lease. No provision of this Guaranty or right of Landlord hereunder may be waived nor may any guarantor be released from any obligation hereunder except by a writing duly executed by an authorized officer, director, trustee or partner of Landlord.

10.     If more than one Person signs this Guaranty, each such Person shall be deemed a Guarantor and the obligation of all such Guarantors shall be joint and several. When the context and construction so requires, all words used in the singular herein shall be deemed to have been used in the plural. The word "Person" as used herein shall include an individual, company, firm, association, partnership, corporation, trust or other legal entity of any kind whatsoever.

11.     Should any one or more provisions of this Guaranty be determined to be illegal or unenforceable, all other provisions shall nevertheless be effective.

12.     The waiver or failure to enforce any provision of this Guaranty shall not operate as a waiver of any other breach of such provision or any other provisions hereof.

13.     If either Landlord or Guarantor participates in an action against the other arising out of or in connection with this Guaranty, the one prevailing shall be entitled to have and recover from the other reasonable attorneys' fees, collection costs and other costs incurred in and in preparation for the actions.

14.     Guarantor agrees that all questions with respect to this Guaranty shall be governed by, and deciding in accordance with the laws of the state in which the Shopping Center is located.

15.     If Guarantor executes this Guaranty as a partnership, each individual executing this Guaranty on behalf of the partnership represents and warrants that he or she is a general partner of the partnership and that this Guaranty is binding upon the partnership in accordance with its terms. If Guarantor executes this Guaranty as a corporation, each of the Persons executing this Guaranty on behalf of the corporation covenants and warrants that the corporation is a duly authorized and existing corporation, that the corporation has and is qualified to transact business in the state in which the Shopping Center is located, that the corporation has full right, authority and power to enter into this Guaranty and to perform its obligations hereunder, that each Person signing this Guaranty on behalf of the corporation is authorized to do so and that this Guaranty is binding upon the corporation in accordance with its terms.

16.     In the event Tenant shall become insolvent or shall be adjudicated a bankrupt, or shall file a petition for reorganization, arrangement or other relief under any present or future provisions of the United States Bankruptcy Code, or if such a petition be filed by creditors of Tenant, or if Tenant shall seek a judicial readjustment of the rights of its creditors under any present or future Federal or State law, or if a receiver of all or part of Tenant's property or assets is appointed by the State or Federal court, no such proceeding or action taken therein shall modify, diminish, or in any way affect the liability of Guarantor under this Guaranty, and the liability of Guarantor with respect to the Lease shall be of the same scope as if Guarantor had itself executed the lease as the named Tenant therein, and no "rejection" and/or "termination" of the Lease in any of the proceedings referred to in this Paragraph 16 shall be effective to release and/or terminate the continuing liability of Guarantor to Landlord under this Guaranty. If, in connection with any of the circumstances referred to in this Paragraph 16, Landlord should request that Guarantor execute a new lease for the balance of the Lease Term (unaffected by any such "rejection" and/or "termination" in any of such proceedings), but in all other respects identical with the Lease, Guarantor shall do so as the named tenant under such new lease (irrespective of the fact that the Lease may have been "rejected" or "terminated" in connection with any of the proceedings referred to in this Paragraph 16). Should Guarantor fail or refuse to execute such a new lease, without limiting any of the legal or equitable remedies available to Landlord on account of such failure or refusal, Guarantor acknowledges and agrees that Landlord may seek specific performance of the covenant of Guarantor contained in this Paragraph 16 to execute such a new lease.

17.     Any legal action or proceeding with respect to this Guaranty may be brought in the courts of the state in which the Shopping Center is located or, if the requisites of jurisdiction are obtained, of the United States of America for the District in which the Shopping Center is located and, by the execution and delivery of this Guaranty, Guarantor hereby accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforementioned courts. Nothing herein shall, however, affect the right of Landlord to commence legal action or otherwise proceed against Guarantor in any other jurisdiction. Guarantor shall and does hereby waive trial by jury, and Landlord, by accepting this Guaranty shall be deemed to have waived trial by jury, in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matter arising out of or in any way connected with this Guaranty or the Lease.

*[Remainder of page intentionally left blank; Signature page to follow]*

Initials: L_____

IN WITNESS WHEREOF, the Guarantor has signed and sealed this Guaranty.

Witness #1:

Print Name: _LINDA MAE BOYLE_

GUARANTOR:

Chris Hirsh

Residential      9733 SW 92 Ter
Address:        Mia FL. 33176

SSN:

Witness #2:

Print Name: _MIGUEL SALAZAR R._

Initials: _____

*march*                    FIRST LEASE AMENDMENT AND EXTENSION OF LEASE                    *28*

THIS FIRST LEASE AMENDMENT AND EXTENSION OF LEASE ("Amendment") is made effective as of the 1st day of ~~January~~, 2014 ("Effective Date"), by and between GRI-EQY (SUNSET 97) LLC, a Delaware limited liability company, hereinafter referred to as "Landlord", C.S.C. ENTERPRISES, INC., a Florida corporation, d/b/a Scully's, hereinafter referred to as "Tenant", CHRIS HIRSH, an individual, hereinafter referred to as "Guarantor", and CASSANDRA HIRSH, an individual, hereinafter referred to as "New Guarantor."

RECITALS:

A.    Landlord and Tenant entered into a Shopping Center Lease Agreement dated December 31, 2008 (the "Lease"), whereby said Tenant let those certain premises, known in Landlord's internal records as space #01, containing approximately 3,940 square feet of Gross Leasable Floor Area ("Leased Premises") located in the Shoppes of Sunset, Miami, Florida ("Shopping Center"), for a period which expired on December 31, 2013. As used in this Amendment, the term "Lease" shall mean the "Lease, as amended hereby," unless its context expressly requires it to mean the original Lease; and

B.    Guarantor executed that certain Guaranty of Lease, attached as Exhibit H to the original Lease, as an inducement for Landlord to execute the original Lease; and

C.    New Guarantor is willing to guarantee the performance of the obligations of Tenant under the Lease, in the manner hereinafter provided; and

D.    Landlord and Tenant desire to extend the Lease Term and amend said Lease in certain respects as hereinafter provided.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby reciprocally acknowledged, Landlord and Tenant agree as set forth below.

1.    Recitals.  The foregoing recitals and representations form a material part of this Amendment and are incorporated herein by this reference.

2.    Lease Term.  The Lease Term is hereby retroactively extended and revised so that the expiration date shall be December 31, 2023 instead of December 31, 2013. The period from January 1, 2014 through December 31, 2023 is hereafter referred to as the "Extended Term". Any provision in the Lease, whether express or implied, which could be construed as providing Tenant a further right to extend the Lease Term past the expiration date of the Extended Term, as set forth in the preceding sentence, shall no longer be applicable.

3.    Base Rent.  During the Extended Term, Base Rent shall be as follows:

| Period | Annually | Monthly | Per Square Foot |
|---|---|---|---|
| 1/1/14-12/31/16 | $122,849.20 | $10,237.43 | $31.18 |
| 1/1/17-12/31/17 | $125,292.00 | $10,441.00 | $31.80 |
| 1/1/18-12/31/18 | $127,813.60 | $10,651.13 | $32.44 |
| 1/1/19-12/31/19 | $130,374.60 | $10,864.55 | $33.09 |
| 1/1/20-12/31/20 | $132,975.00 | $11,081.25 | $33.75 |
| 1/1/21-12/31/21 | $135,654.20 | $11,304.52 | $34.43 |
| 1/1/22-12/31/22 | $138,333.40 | $11,527.78 | $35.11 |
| 1/1/23-12/31/23 | $141,130.80 | $11,760.90 | $35.82 |

4.    Past Due Amount.  Tenant shall pay to Landlord any past due balance on its account ("Past Due Amount"), bringing its account current, simultaneously with the submission to Landlord of Tenant executed copies of this Amendment. As of March 1, 2014 the Past Due Amount to be submitted by Tenant simultaneously with the Tenant executed copies of this Amendment is Twenty-Seven Thousand Seven Hundred Twenty-Nine and 41/100 Dollars ($27,729.41). In the event that Tenant fails to provide payment for the Past Due Amount as described in this Paragraph 4, Landlord shall be entitled to all remedies available at law and in the Lease regarding collection of such past due amount. Landlord shall also have the right (but not the obligation) to delay its execution of this Amendment until Tenant provides such payment of the past due amount to Landlord.

5.    Insurance Certificate.  Tenant shall submit to Landlord a current certificate of insurance evidencing all policies of insurance required to be carried by Tenant under the Lease simultaneously with the submission to Landlord of Tenant executed copies of this Amendment.  In the event that Tenant fails to provide the insurance certificate as described in this Paragraph 5, Landlord shall be entitled to all remedies available under the Lease regarding such default. Landlord shall also have the right (but not the obligation) to delay its execution of this Amendment until Tenant provides such current insurance certificate to Landlord.

6.    Guarantor.  Guarantor hereby expressly agrees that Guarantor shall continue to be liable for the performance of all covenants and conditions of the Lease and any amendments, modifications, and renewals of the Lease (including, specifically, those made hereby) to be performed by Tenant, including, specifically, the payment of Rent and all other charges and payments to be made under the Lease, as modified herein.  Guarantor joins in the execution hereof to evidence Guarantor's consent hereto and continuing obligations with regard to the Lease.

7.    New Guarantor.  New Guarantor hereby expressly agrees that it shall be liable for the performance of all covenants and conditions of the Lease and any amendments, modifications, renewals of the Lease (including, specifically, those made hereby) to be performed by Tenant, including, specifically, the payment of Rent and all other charges and payments to be made under the Lease, jointly and severally with Guarantor. New Guarantor joins in the execution hereof, and agrees to execute the Guaranty attached hereto as Exhibit A, to evidence its consent hereto and continuing obligations with regard to the Lease.

1

**EXHIBIT "B"**

8.    Improvement Allowance. In consideration of Tenant's completion of various work in the Leased Premises, and provided Tenant is not in default, Landlord agrees to pay Tenant the lesser of (i) the actual cost of said work, or (ii) Forty Thousand and 00/100 Dollars ($40,000.00) (the "Allowance"). Landlord will pay the Allowance to Tenant in one (1) payment, paid after the Payment Requirements (as defined below) are received by Landlord.

Landlord will pay the Allowance within thirty (30) after the later of the following to occur (the following are collectively referred to as the "Payment Requirements"):

(a)    Tenant has furnished Landlord with (i) an affidavit certifying that all work, labor and materials have been paid for, (ii) final lien waivers, as well as paid invoices or statements, from (xx) all contractors and subcontractors who performed work at the Leased Premises; and (yy) all materialmen and suppliers who provided materials and/or equipment used in connection with Tenant's work at the Leased Premises;

(b)    Tenant is fully staffed, fixtured and open to the public for business in the Leased Premises;

(c)    Tenant has submitted to Landlord a certificate of insurance evidencing Tenant's compliance with the terms and conditions set forth in Article 12(B) of the Lease; and

(d)    Tenant complies with all other terms and conditions set forth in this Amendment.

Upon expiration or sooner termination of the Lease, all improvements and additions to the Leased Premises (other than Tenant's trade fixtures and movable personal property) shall be deemed the property of the Landlord, and all other alterations, decorations, additions and improvements made by Tenant to the Leased Premises, including all heating and air conditioning units, equipment and apparatus at the Leased Premises and other fixtures such as ceiling tiles and grids, lighting fixtures, electric panel boxes, plumbing, boilers, floor and wall coverings, alarm systems, lights, toilet fixtures, partitions, doors and utilities shall be deemed attached to the freehold and be Landlord's property and Tenant shall have no right to alter or remove said improvements paid for with the Allowance without Landlord's consent.

If Tenant shall default under any of the terms and provisions of the Lease and/or this Amendment, and Tenant shall fail to cure such default within the time permitted for cure pursuant to the applicable terms and provisions of the Lease, if any, Tenant shall become obligated to pay to Landlord, immediately upon receipt of written demand therefor from Landlord, or Landlord's designated agents or representatives, the unamortized portion of the Allowance. Such unamortized portion shall be calculated by amortizing the Allowance on a straight line basis over the Extended Term. The rights of Landlord under the terms and provisions of this section shall be in addition to, and not in limitation of, any other rights and remedies available to Landlord in the event of default by Tenant, under the terms and provisions of the Lease, or otherwise available to Landlord at law or in equity. If Tenant shall fail request the Allowance within ninety (90) days of the mutual execution of this Amendment, then Tenant shall have forfeited any and all rights to said Allowance.

9.    Prohibited Uses. In addition to the Prohibited Uses set forth in Exhibit F of the original Lease, Tenant shall not use the Leased Premises in violation of any of the following:

a.    A dentist.

b.    The sale of uniforms.

10.    Broker. Each of the parties hereto represents and warrants that, there are no brokerage commissions or finders' fees of any kind due in connection with this Amendment, and each of the parties hereto agrees to indemnify the other against, and hold it harmless from, any and all liabilities, damages, costs, claims and obligations arising from any such claim (including, without limitation, the cost of attorneys' fees in connection therewith).

11.    Defined Terms. Terms that are defined in the Lease shall have the same meanings when such terms are used in this Amendment.

12.    Confirmation of Terms. All of the terms, covenants and conditions of the Lease, except as are herein specifically modified and amended, shall remain in full force and effect and are hereby adopted and reaffirmed by the parties hereto.

[END OF TEXT; SIGNATURE PAGE FOLLOWS]

2

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound, have executed this Amendment under their respective seals on the day and year first above written.

Signed, and Delivered in the presence of:

**LANDLORD:**

Witness #1 as to Landlord:

Print Name: _Tamara Mullen_

**GRI-EQY (Sunset 97), LLC, a Delaware limited liability company**
    By: GRI-EQY I, LLC, Managing Member
      By: EQY Portfolio Investor (GRI) Inc.,
        Manager

Witness #2 as to Landlord:

Print Name: _Jennifer Germain_

By: _____
    Arthur L. Gallagher, Vice President

**TENANT:**

Witness #1 as to Tenant:

Print Name: _LINDA MAE BOYLE_

**C.S.C ENTERPRISE, INC., a Florida corporation d/b/a Scully's**

By: _____ (SEAL)

Name: _Chris E Hirsh_

Witness #2 as to Tenant:

Print Name: _Michelle Freeman_

Title: _Pres._

**GUARANTOR:**

Witness #1 as to Guarantor:

Print Name: _LINDA MAE BOYLE_

_____ (SEAL)
**CHRIS HIRSH**
Last 4 Digits of SSN: ▮▮▮▮
Home Address: 9733 S.W., 82nd Terrace
               Miami, FL 33176

Witness #2 as to Guarantor:

Print Name: _Michelle Freeman_

**NEW GUARANTOR:**

Witness #1 as to New Guarantor:

Print Name: _LINDA MAE BOYLE_

_Cassandra Hirsh_ (SEAL)
**CASSANDRA HIRSH**
Last 4 Digits of SSN: ▮▮▮▮
Home Address: 9733 S.W., 82nd Terrace
               Miami, FL 33176

Witness #2 as to New Guarantor:

Print Name: _Michelle Freeman_

Y:\wpfiles\Equity One\Shoppes of Sunset I\Scully's\Renewal (2014)\Scully's Lease Amendment v2b (from HSFH - IFR).doc

EXHIBIT A

GUARANTY OF LEASE

THIS GUARANTY OF LEASE (this "Guaranty") is made for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, by CASSANDRA HIRSH ("New Guarantor") in favor of GRI-EQY (SUNSET 97) LLC, a Delaware limited liability company ("Landlord"), in connection with that certain First Lease Amendment and Extension of Lease (the "Amendment"), which amends that certain Shopping Center Lease Agreement dated December 31, 2008 (the "Original Lease") (the Amendment and the Original Lease shall collectively be referred to herein as the "Lease"), pursuant to which Landlord leases to C.S.C. ENTERPRISES, INC., a Florida corporation, d/b/a Scully's ("Tenant"), that certain premises generally referred to as Space No. 01, (the "Premises") in the Shopping Center known as the Shoppes of Sunset, located in the City of Miami, State of Florida (the "Shopping Center").

1.       New Guarantor does hereby absolutely, unconditionally and irrevocably guarantee and promise to Landlord the due, punctual and full performance by Tenant of each and all of the agreements, covenants, obligations, liabilities and promises of Tenant to be performed during the Lease Term (as hereinafter defined) and the truth and accuracy of each and all of the representations and warranties of Tenant contained in the Lease, including without limitation, the payment of Base Rent, Operating Expenses and all items of Additional Rent (as defined in the Lease) and any and all other sums payable thereunder. For the purposes of this Guaranty, the term "Lease Term" refers not only to the Term as defined in the Lease, but also to any renewals, extensions, modifications, reinstatements and holdings over thereof.

2.       New Guarantor's obligations and covenants under this Guaranty shall in no way be affected or impaired by reason of the happening from time to time of any of the following, whether or not New Guarantor has been notified thereof or consented thereto: (a) Landlord's waiver of the performance or observance by Tenant, New Guarantor or any other party of any covenant or condition contained in the Lease or this Guaranty; (b) any extension, in whole or in part, of the time for payment by Tenant or New Guarantor of any sums owing or payable under the Lease or this Guaranty, or of any other sums or obligations under or arising out of or on account of the Lease or this Guaranty; (c) the renewal or extension of the term of the Lease, or any holdover beyond the term of the Lease; (d) any assignment of the Lease or subletting of the Premises or any part thereof; (e) any term, covenant or condition of the Lease may be amended, modified, compromised, released or otherwise altered by Landlord (whether material or otherwise); (f) the doing or the omission of any act referred to in the Lease or this Guaranty (including the giving of any consent referred to in the Lease or this Guaranty); (g) Landlord's failure or delay to exercise any right or remedy available to Landlord or any action on the part of Landlord granting indulgence or extension in any form whatsoever; (h) the voluntary or involuntary liquidation, dissolution, sale of any or all of the assets, marshaling of assets and liabilities, receivership, conservatorship, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition or readjustment of, or other similar proceeding affecting Tenant or New Guarantor or any of Tenant's or New Guarantor's assets; or (i) the release of Tenant or New Guarantor from the performance or observation of any covenant or condition contained in the Lease or this Guaranty by operation of law, other than by full payment of their obligations.

3.       New Guarantor does hereby agree that, without the consent of or notice to New Guarantor and without affecting any of the obligations of New Guarantor hereunder: (a) New Guarantor does guarantee and promise to perform all the obligations of Tenant under the Lease as so amended, compromised, released or altered; (b) any guarantor of or party to the Lease may be released, substituted or added; (c) any right or remedy under the Lease, this Guaranty or any other instrument or agreement may be exercised, not exercised, impaired, modified, limited, destroyed, or suspended; (d) Landlord or any other Person (hereinafter defined in Paragraph 10 below) may deal in any manner with Tenant, any guarantor, any party to the Lease or any other Person; and (e) all or any part of the premises or of Tenant's rights or liabilities under the Lease may be sublet, assigned or assumed.

4.       New Guarantor hereby waives and agrees not to assert or take advantage of: (a) any right to require Landlord to proceed against Tenant or any other Person or to pursue any other remedy before proceeding against New Guarantor; (b) the defense of any statute of limitations in any action under or related to this Guaranty or the Lease; (c) any right or defense that may arise by reason of the incapacity, lack of authority, death or disability of Tenant or any other Person; (d) any right or defense arising by reason of the absence, impairment, modification, limitation, destruction or cessation (in bankruptcy, by an election or remedies, or otherwise) of the liability of Tenant, of the subrogation rights of New Guarantor or of the right of New Guarantor to proceed against Tenant for reimbursement; and (e) the benefits of any statutory provision or procedural rule limiting the liability of a surety New Guarantor hereby waives and agrees not to assert or take advantage of any right or defense based on the absence of any or all presentments, demands (including demands for performance), notices (including notices of adverse change in the financial status of Tenant or other facts which increases the risk to New Guarantor, notices of non-performance and notices of acceptance of this Guaranty) and protests of each every kind.

5.       New Guarantor does hereby agree that if claim is ever made upon Landlord for repayment or recovery of any amount or amounts received by Landlord in payment or on account of the amounts hereby guaranteed and Landlord repays all or part of such amount by reason of (a) any judgment, decree or order or of any court or administrative body having jurisdiction or (b) any settlement or compromise of any such claim effected by Landlord with any such claimant (including Tenant or any other guarantor), then in such event New Guarantor agrees that any such judgment, decree, order, settlement or compromise shall be binding upon New Guarantor, notwithstanding the expiration or termination of the Lease or other instrument evidencing any of the amounts hereby guaranteed and New Guarantor shall be and remain liable hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by Landlord.

6.       New Guarantor does hereby agree that for Landlord's benefit and the benefit of Tenant and to the fullest extent permitted by law, New Guarantor irrevocably and unconditionally waives any and all rights of subrogation, reimbursement, indemnification, contribution, or similar rights against Tenant or its assets (arising by contract or by law or otherwise) as a consequence of this Guaranty, including, without limitation, the payment or performance of any obligations hereby guaranteed, and further agrees that New Guarantor will not assert any such right of subrogation, reimbursement, indemnification, contribution or similar right at any time in respect to the Lease. It is agreed that Landlord's rights under this Paragraph 6 are such that the

4

remedy at law for breach thereof would be inadequate, and that Landlord shall be entitled to specific performance and enforcement thereof, including, without limitation, the imposition of a restraining order or injunction. Nothing in this Paragraph 6 shall diminish or relieve any obligations or liabilities of Tenant to Landlord. Landlord and Tenant and their respective successors and assigns are intended third party beneficiaries of the waivers and agreements made in this Paragraph 6 and Landlord's rights under this Paragraph 6 shall survive the expiration or termination of the Lease.

7.  The liability of New Guarantor and all rights, powers and remedies of Landlord hereunder and the liability and obligations of Tenant and all rights, powers and remedies of Landlord under the Lease and under this Guaranty shall be in addition to all rights, powers and remedies given to Landlord by law.

8.  This Guaranty applies to, inures to the benefit of and binds all parties hereto, and their respective heirs, devisees, legatees, executors, administrators, representatives, successors and assigns (including any purchaser at judicial foreclosure or trustee's sale or a holder of a deed in lieu thereof). This Guaranty may be assigned by Landlord voluntarily or by operation of law without reducing or modifying the liability of New Guarantor hereunder.

9.  This Guaranty shall constitute the entire agreement between New Guarantor and Landlord with respect to the New Guarantor's guaranty of performance of all of Tenant's obligations under the Lease. No provision of this Guaranty or right of Landlord hereunder may be waived nor may any guarantor be released from any obligation hereunder except by a writing duly executed by an authorized officer, director, trustee or partner of Landlord.

10.  If more than one Person signs this Guaranty, each such Person shall be deemed a New Guarantor and the obligation of all such New Guarantors shall be joint and several. When the context and construction so requires, all words used in the singular herein shall be deemed to have been used in the plural. The word "Person" as used herein shall include an individual, company, firm, association, partnership, corporation, trust or other legal entity of any kind whatsoever.

11.  Should any one or more provisions of this Guaranty be determined to be illegal or unenforceable, all other provisions shall nevertheless be effective.

12.  The waiver or failure to enforce any provision of this Guaranty shall not operate as a waiver of any other breach of such provision or any other provisions hereof.

13.  If either Landlord or New Guarantor participates in an action against the other arising out of or in connection with this Guaranty, the one prevailing shall be entitled to have and recover from the other reasonable attorneys' fees, collection costs and other costs incurred in and in preparation for the actions.

14.  New Guarantor agrees that all questions with respect to this Guaranty shall be governed by, and deciding in accordance with the laws of the state in which the Shopping Center is located, provided, however, that any action on this Guaranty may be brought in any jurisdiction in which an action on the Lease is brought, or in any other proper forum, at the sole option of Landlord. Capitalized terms used but not defined in this Guaranty shall have the same meanings ascribed to them in the Lease.

15.  Intentionally Deleted.

16.  In the event Tenant shall become insolvent or shall be adjudicated a bankrupt, or shall file a petition for reorganization, arrangement or other relief under any present or future provisions of the United States Bankruptcy Code, or if such a petition be filed by creditors of Tenant, or if Tenant shall seek a judicial readjustment of the rights of its creditors under any present or future Federal or State law, or if a receiver of all or part of Tenant's property or assets is appointed by the State or Federal court, no such proceeding or action taken therein shall modify, diminish, or in any way affect the liability of New Guarantor under this Guaranty, and the liability of New Guarantor with respect to the Lease shall be of the same scope as if New Guarantor had itself executed the lease as the named Tenant therein, and no "rejection" and/or "termination" of the Lease in any of the proceedings referred to in this Paragraph 16 shall be effective to release and/or terminate the continuing liability of New Guarantor to Landlord under this Guaranty. If, in connection with any of the circumstances referred to in this Paragraph 16, Landlord should request that New Guarantor execute a new lease for the balance of the Lease Term (unaffected by any such "rejection" and/or "termination" in any of such proceedings), but in all other respects identical with the Lease, New Guarantor shall do so as the named tenant under such new lease (irrespective of the fact that the Lease may have been "rejected" or "terminated" in connection with any of the proceedings referred to in this Paragraph 16). Should New Guarantor fail or refuse to execute such a new lease, without limiting any of the legal or equitable remedies available to Landlord on account of such failure or refusal, New Guarantor acknowledges and agrees that Landlord may seek specific performance of the covenant of New Guarantor contained in this Paragraph 16 to execute such a new lease.

17.  Any legal action or proceeding with respect to this Guaranty may be brought in the courts of the state in which the Shopping Center is located or, if the requisites of jurisdiction are obtained, of the United States of America for the District in which the Shopping Center is located and, by the execution and delivery of this Guaranty, New Guarantor hereby accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforementioned courts. Nothing herein shall, however, affect the right of Landlord to commence legal action or otherwise proceed against New Guarantor in any other jurisdiction. New Guarantor shall and does hereby waive trial by jury, and Landlord, by accepting this Guaranty shall be deemed to have waived trial by jury, in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matter arising out of or in any way connected with this Guaranty or the Lease.

18.  WAIVER. TO THE EXTENT NOT PROHIBITED BY LAW, NEW GUARANTOR HEREBY EXPRESSLY WAIVES (A) ANY RIGHT NEW GUARANTOR MAY NOW OR HEREAFTER HAVE TO ANY HEARING PRIOR TO THE ATTACHMENT OF ANY REAL OR PERSONAL PROPERTY TO SATISFY NEW GUARANTOR'S OBLIGATIONS, (B) THE BENEFITS OF ANY PRESENT OR FUTURE CONSTITUTION, STATUTE OR RULE OF LAW WHICH EXEMPTS PROPERTY FROM LIABILITY FOR DEBT, AND (C) THE RIGHT TO TRIAL BY JURY IN ANY ACTION THAT MAY HEREAFTER BE INSTITUTED WITH RESPECT TO THIS GUARANTY. NEW GUARANTOR IRREVOCABLY APPOINTS TENANT AS ITS AGENT FOR SERVICE OF PROCESS IN CONNECTION WITH THIS GUARANTY. THIS WAIVER IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE, AND NEW GUARANTOR ACKNOWLEDGES (I) THAT NEITHER LANDLORD, NOR ANY PERSON ACTING ON BEHALF OF LANDLORD, HAS

5

MADE ANY REPRESENTATIONS OF FACT TO INDUCE THIS WAIVER OR IN ANY WAY MODIFY ITS EFFECT, AND (II) THAT NEW GUARANTOR HAS READ AND UNDERSTANDS THE MEANING AND RAMIFICATIONS OF THIS WAIVER PROVISION.

19.    This Guaranty may not be modified or amended except by a written agreement duly executed by the parties hereto, and shall be binding upon, and inure to the benefit of, the parties.

20.    New Guarantor's liability shall be primary and joint and several with that of Tenant and any guarantor or surety. Landlord may proceed against New Guarantor under this Guaranty without initiating or exhausting any right or remedy against Tenant or any guarantor or surety, and may proceed against Tenant and New Guarantor and any other guarantor or surety separately or concurrently. This is a guaranty of payment and not of collection.

21.    Within five (5) days after Landlord's written request, New Guarantor shall execute and deliver to Landlord a written statement certifying any matter concerning this Guaranty or the Lease as Landlord may request.

22.    Any notice which Landlord may elect to send shall be binding upon New Guarantor if mailed to New Guarantor's address set forth below or last address known to Landlord, by United States certified or registered mail, return receipt requested.

*[Remainder of page intentionally left blank; Signature page to follow]*

6

IN WITNESS WHEREOF, the New Guarantor has signed and delivered this Guaranty.

NEW GUARANTOR:

Witness #1 as to New Guarantor:

_(signature)_    _(signature)_ (SEAL)

Print Name: _Linda Mae Boyle_    CASSANDRA HIRSH
SSN: ▮▮▮▮▮▮▮▮
Home Address: 9733 S.W., 82nd Terrace
Miami, FL 33176

Witness #2 as to New Guarantor:

_(signature)_

Print Name: _Michelle Freeman_

7

| Tenant Number | Bill Code | Invoice Date | Due Date | Gross Rent | Open Amount | Remark |
|---|---|---|---|---|---|---|
| 742813 | BASE | 3/1/2021 | 3/1/2021 | $11,304.52 | $11,304.52 | Min. Rent |
| 742813 | CAM | 3/1/2021 | 3/1/2021 | $1,386.11 | $1,386.11 | CAM |
| 742813 | INS | 3/1/2021 | 3/1/2021 | $305.09 | $305.09 | INSURANCE |
| 742813 | RET | 3/1/2021 | 3/1/2021 | $1,437.80 | $1,437.80 | REAL ESTATE TAX |
| 742813 | STAX | 3/1/2021 | 3/1/2021 | $734.79 | $734.79 | FL- Miami (6.5%) |
| 742813 | STAX | 3/1/2021 | 3/1/2021 | $90.10 | $90.10 | FL- Miami (6.5%) |
| 742813 | STAX | 3/1/2021 | 3/1/2021 | $19.83 | $19.83 | FL- Miami (6.5%) |
| 742813 | STAX | 3/1/2021 | 3/1/2021 | $93.46 | $93.46 | FL- Miami (6.5%) |
| 742813 | STAX | 3/1/2021 | 3/1/2021 | $50.21 | $50.21 | FL- Miami (6.5%) |
| 742813 | TWTX | 3/1/2021 | 3/1/2021 | $772.53 | $772.53 | Tenant Waste - Taxable |
| 742813 | BASE | 2/1/2021 | 2/1/2021 | $11,304.52 | $11,304.52 | Min. Rent |
| 742813 | CAM | 2/1/2021 | 2/1/2021 | $1,386.11 | $1,386.11 | CAM |
| 742813 | INS | 2/1/2021 | 2/1/2021 | $305.09 | $305.09 | INSURANCE |
| 742813 | RET | 2/1/2021 | 2/1/2021 | $1,437.80 | $1,437.80 | REAL ESTATE TAX |
| 742813 | STAX | 2/1/2021 | 2/1/2021 | $734.79 | $734.79 | FL- Miami (6.5%) |
| 742813 | STAX | 2/1/2021 | 2/1/2021 | $90.10 | $90.10 | FL- Miami (6.5%) |
| 742813 | STAX | 2/1/2021 | 2/1/2021 | $19.83 | $19.83 | FL- Miami (6.5%) |
| 742813 | STAX | 2/1/2021 | 2/1/2021 | $93.46 | $93.46 | FL- Miami (6.5%) |
| 742813 | STAX | 2/1/2021 | 2/1/2021 | $50.21 | $50.21 | FL- Miami (6.5%) |
| 742813 | TWTX | 2/1/2021 | 2/1/2021 | $772.53 | $772.53 | Tenant Waste - Taxable |
| 742813 | NSF | 1/19/2021 | 1/19/2021 | $35.00 | $35.00 | R01-INSUFFICIENT FUNDS |
| 742813 | STAX | 1/19/2021 | 1/19/2021 | ($138.81) | ($138.81) | FL- Miami (6.5%) |
| 742813 | TWTX | 1/19/2021 | 1/19/2021 | ($2,135.60) | ($2,135.60) | 2020 Waste Reconciliation |
| 742813 | BASE | 1/1/2021 | 1/1/2021 | $11,304.52 | $5,816.37 | Min. Rent |
| 742813 | STAX | 1/1/2021 | 1/1/2021 | $734.79 | $378.07 | FL- Miami (6.5%) |
| 742813 | NSF | 12/17/2020 | 12/17/2020 | $35.00 | $35.00 | R01-INSUFFICIENT FUNDS |
| 742813 | BASE | 12/1/2020 | 12/1/2020 | $11,081.25 | $11,081.25 | Min. Rent |
| 742813 | CAM | 12/1/2020 | 12/1/2020 | $1,672.09 | $1,672.09 | CAM |
| 742813 | INS | 12/1/2020 | 12/1/2020 | $175.84 | $175.84 | INSURANCE |
| 742813 | RET | 12/1/2020 | 12/1/2020 | $1,314.38 | $1,314.38 | REAL ESTATE TAX |
| 742813 | STAX | 12/1/2020 | 12/1/2020 | $720.28 | $720.28 | FL- Miami (6.5%) |
| 742813 | STAX | 12/1/2020 | 12/1/2020 | $48.75 | $48.75 | FL- Miami (6.5%) |
| 742813 | STAX | 12/1/2020 | 12/1/2020 | $108.69 | $108.69 | FL- Miami (6.5%) |
| 742813 | STAX | 12/1/2020 | 12/1/2020 | $11.43 | $11.43 | FL- Miami (6.5%) |
| 742813 | STAX | 12/1/2020 | 12/1/2020 | $85.43 | $85.43 | FL- Miami (6.5%) |
| 742813 | TWTX | 12/1/2020 | 12/1/2020 | $750.03 | $750.03 | Tenant Waste - Taxable |
| 742813 | NSF | 11/19/2020 | 11/19/2020 | $35.00 | $35.00 | NSF PMT 11/17/2020 |
| 742813 | BASE | 11/1/2020 | 11/1/2020 | $11,081.25 | $10,298.75 | Min. Rent |
| 742813 | STAX | 11/1/2020 | 11/1/2020 | $720.28 | $669.42 | FL- Miami (6.5%) |
| 742813 | BASE | 10/1/2020 | 10/1/2020 | $11,081.25 | $7,481.85 | Min. Rent |
| 742813 | STAX | 10/1/2020 | 10/1/2020 | $720.28 | $486.32 | FL- Miami (6.5%) |
| 742813 | BASE | 9/1/2020 | 9/1/2020 | $11,081.25 | $7,481.85 | Min. Rent |
| 742813 | STAX | 9/1/2020 | 9/1/2020 | $720.28 | $486.32 | FL- Miami (6.5%) |
| 742813 | STAX | 8/10/2020 | 9/9/2020 | ($52.05) | ($52.05) | FL- Miami (6.5%) |
| 742813 | SUPP | 8/10/2020 | 9/9/2020 | ($800.77) | ($800.77) | SUPP RET REC PRIOR YR |
| 742813 | BASE | 8/1/2020 | 8/1/2020 | $11,081.25 | $3,256.51 | Min. Rent |
| 742813 | STAX | 8/1/2020 | 8/1/2020 | $720.28 | $211.66 | FL- Miami (6.5%) |
| 742813 | BASE | 7/1/2020 | 7/1/2020 | $11,081.25 | $9,359.79 | Min. Rent |
| 742813 | STAX | 7/1/2020 | 7/1/2020 | $720.28 | $608.36 | FL- Miami (6.5%) |
| 742813 | STAX | 6/20/2020 | 7/20/2020 | ($52.65) | ($52.65) | FL- Miami (6.5%) |
| 742813 | SUPP | 6/20/2020 | 7/20/2020 | ($810.14) | ($810.14) | SUPP RET REC PRIOR YR |
| 742813 | NSF | 6/19/2020 | 6/19/2020 | $35.00 | $35.00 | NSF Online PMT 06/15/2020 |
| 742813 | CAMP | 6/15/2020 | 7/15/2020 | ($1,945.97) | ($1,945.97) | CAM REC PRIOR YEAR |
| 742813 | INSP | 6/15/2020 | 7/15/2020 | ($540.55) | ($540.55) | INSURANCE REC PRIOR YEAR |
| 742813 | RETP | 6/15/2020 | 7/15/2020 | $1,681.52 | $1,681.52 | REAL ESTATE TAX REC PRIOR YEAR |
| 742813 | STAX | 6/15/2020 | 7/15/2020 | ($126.49) | ($126.49) | FL- Miami (6.5%) |
| 742813 | STAX | 6/15/2020 | 7/15/2020 | ($35.14) | ($35.14) | FL- Miami (6.5%) |
| 742813 | STAX | 6/15/2020 | 7/15/2020 | $109.30 | $109.30 | FL- Miami (6.5%) |
| 742813 | BASE | 6/1/2020 | 6/1/2020 | $11,081.25 | $11,081.25 | Min. Rent |
| 742813 | CAM | 6/1/2020 | 6/1/2020 | $1,672.09 | $1,672.09 | CAM |
| 742813 | INS | 6/1/2020 | 6/1/2020 | $175.84 | $175.84 | INSURANCE |
| 742813 | RET | 6/1/2020 | 6/1/2020 | $1,314.38 | $1,314.38 | REAL ESTATE TAX |
| 742813 | STAX | 6/1/2020 | 6/1/2020 | $720.28 | $720.28 | FL- Miami (6.5%) |
| 742813 | STAX | 6/1/2020 | 6/1/2020 | $48.75 | $48.75 | FL- Miami (6.5%) |
| 742813 | STAX | 6/1/2020 | 6/1/2020 | $108.69 | $108.69 | FL- Miami (6.5%) |
| 742813 | STAX | 6/1/2020 | 6/1/2020 | $11.43 | $11.43 | FL- Miami (6.5%) |
| 742813 | STAX | 6/1/2020 | 6/1/2020 | $85.43 | $85.43 | FL- Miami (6.5%) |
| 742813 | TWTX | 6/1/2020 | 6/1/2020 | $750.03 | $750.03 | Tenant Waste - Taxable |
| 742813 | BASE | 5/1/2020 | 5/1/2020 | $11,081.25 | $11,081.25 | Min. Rent |
| 742813 | CAM | 5/1/2020 | 5/1/2020 | $1,672.09 | $1,672.09 | CAM |
| 742813 | INS | 5/1/2020 | 5/1/2020 | $175.84 | $175.84 | INSURANCE |
| 742813 | RET | 5/1/2020 | 5/1/2020 | $1,314.38 | $1,314.38 | REAL ESTATE TAX |
| 742813 | STAX | 5/1/2020 | 5/1/2020 | $720.28 | $720.28 | FL- Miami (6.5%) |
| 742813 | STAX | 5/1/2020 | 5/1/2020 | $48.75 | $48.75 | FL- Miami (6.5%) |
| 742813 | STAX | 5/1/2020 | 5/1/2020 | $108.69 | $108.69 | FL- Miami (6.5%) |
| 742813 | STAX | 5/1/2020 | 5/1/2020 | $11.43 | $11.43 | FL- Miami (6.5%) |
| 742813 | STAX | 5/1/2020 | 5/1/2020 | $85.43 | $85.43 | FL- Miami (6.5%) |
| 742813 | TWTX | 5/1/2020 | 5/1/2020 | $750.03 | $750.03 | Tenant Waste - Taxable |
| 742813 | BASE | 4/1/2020 | 4/1/2020 | $11,081.25 | $3,147.23 | Min. Rent |
| 742813 | STAX | 4/1/2020 | 4/1/2020 | $720.28 | $204.57 | FL- Miami (6.5%) |
| | | | | | $125,473.12 | |

EXHIBIT

C

tabbies